James S. CAREY

v.

GREYHOUND LINES, INC., et al.

Civ. A. No. 71–522.

United States District Court,
E. D. Louisiana.

June 15, 1973.

Louis A. Gerdes, Jr., Thierry & Gerdes, New Orleans, La., for plaintiff.

William F. Kirsch, Jr., Heiskell, Donelson, Adams, Williams & Wall, Memphis, Tenn., for Greyhound.

Steven R. Plotkin, New Orleans, La., for Local 275.

C. Paul Barker, Dodd, Hirsch, Barker, Meunier, Boudreaux & Lamy, New Orleans, La., for Div. 1174.

BOYLE, District Judge:

James S. Carey instituted this action [1] pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., alleging racial discrimination in employment on the part of the defendants, Greyhound Bus Company, Inc. (actually Greyhound Lines, Inc. and hereinafter referred to as Greyhound), Local 1174 Amalgamated Transit Union (hereinafter Division 1174) and Local 275, New Orleans Building Maintenance Union (hereinafter Local 275). Carey seeks a preliminary and permanent injunction preventing defendants from interfering with his rights to equal employment opportunities, a revised seniority status, back pay, other employment benefits, damages, general and special, and attorney's fees. The case has been submitted for adjudication on the merits on stipulations of facts, exhibits and memoranda.

The old Teche Greyhound Lines provided bus service in southern Louisiana along the Mississippi Gulf Coast through southern Alabama into parts of Georgia and Florida. The Teche Greyhound Lines became Southeastern Greyhound and later Southern Greyhound Lines, a division of Greyhound Corporation and is now known as Greyhound Lines-East, a division of Greyhound Lines, Inc.

Defendant Greyhound operates terminals in the cities of Mobile, Montgomery, New Orleans and Baton Rouge which four terminals constitute one seniority district for employment purposes. Greyhound employees in this district are grouped into three general seniority categories—bus operators, maintenance personnel (mechanics and other garage workers) and terminal employees. Since 1944 there have been two classes of terminal employees. Class A consists of ticket agents, platform agents, telephone information agents, counter information agents, starters, baggage agents, express agents, travel agents and ticket listers-report makers whose work is wholly or partly clerical; and Class B is made up of janitors, maids and porters.

Through certification by the National Labor Relations Board, Division 1174 represents all Greyhound employees of the three main seniority groups in Mobile, Montgomery and Baton Rouge. In New Orleans, Division 1174 represents the bus operators, maintenance personnel (with the exception of some garage employees not pertinent hereto) and Class A of the terminal employees. Class B terminal employees in New Orleans have always been and are presently represented by Local 275 also certified by the National Labor Relations Board.

Previous contracts between Greyhound and Division 1174 have established three separate and distinct seniority rosters for the bus operators, maintenance personnel and terminal employees. Employees in one seniority group cannot exercise their seniority in another group. In Division 1174's contracts with Greyhound the terminal employees of both Class A and Class B have always been covered by a single seniority list, but it was not until 1964 that if a vacancy in a position occurred in Class A and there was no bidder from Class A, then the

---

1. The action was originally filed as a class action. The motion of the defendants, Greyhound Lines, Inc and Division 1174 Amalgamated Transit Union, to strike the class action was granted. See Record Document No. 47.

senior employee in Class B who bid would be assigned the job. Employees within one seniority group could, however, exercise their seniority at other terminals within the seniority district. Class B terminal employees in New Orleans did not enjoy the benefits of Division 1174's contract since they were governed by Local 275's contract.

The 1966 contract between Division 1174 and Greyhound with respect to terminal employees provided that when a vacancy occurred in either Class A or Class B, any terminal employee, either from Class A or Class B, could bid on and would be awarded the job on the basis of seniority, regardless of whether acquired in Class A or Class B. This contract fixed a common seniority date for both Class A and Class B employees, without respect to their race, as of November 1, 1964 for purposes of interclass bidding. Again the terminal employees represented by Division 1174 could exercise their seniority at any other terminal in the seniority district. And again these benefits did not enure to the Local 275 Class B employees in New Orleans. The 1968–71 contract between Division 1174 and Greyhound retained this provision for interclass bidding. The new contract entered into in November, 1971, eliminated the 1964 common seniority date and provided that an employee's seniority would be determined by the date of his first employment by Greyhound.

After November of 1964 Greyhound adopted a hiring policy at the New Orleans Terminal of giving the Class B employees there, those who were represented by Local 275, an opportunity to bid on vacancies existing in Class A jobs which were not bid on by any Division 1174 terminal employees. These jobs were awarded to the bidder from Class B who had the most seniority under the contract with Local 275. This hiring policy was unilaterally adopted by defendant Greyhound and did not result from collective bargaining with either Division 1174 or Local 275. Once hired into Class A and thus coming within

representation by Division 1174, the former Class B employee's seniority is determined from the date he was hired into Class A and not from the date he started working for Greyhound as a Class B terminal employee. However, former New Orleans Class B employees who are awarded jobs in Class A may retain their seniority in Local 275 for a period of ninety days.

Plaintiff Carey was hired by Greyhound on May 18, 1957, as porter, a Class B job category represented by Local 275. On October 10, 1966, plaintiff bid and was awarded an agent's position, a Class A job within the bargaining unit represented by Division 1174. On December 8, 1966, plaintiff was "bumped" from the agent's job by a senior member of Division 1174 and rather than transfer, returned to his job as a porter retaining his seniority with Local 275. Plaintiff bid on and was awarded the job of telephone information agent, Class A, in New Orleans on July 3, 1968. On February 12, 1969, he bid on and was awarded the job of ticket agent, but in less than two months he was "bumped" to the position of telephone information agent. Through the bidding process, plaintiff became an express agent on December 10, 1969. Plaintiff was again "bumped" by a senior employee on September 9, 1970; he then transferred to the Baton Rouge terminal to take a job as an express agent. On April 14, 1971, Carey returned to the New Orleans terminal as an express agent and since that time has held positions as express agent and telephone information agent. After appropriate application, plaintiff Carey was admitted to membership in Division 1174 as soon as he became eligible and maintains seniority with Division 1174 as of July 3, 1968.

The hiring practices of defendant Greyhound at its New Orleans Terminal between the years 1936 and 1971 are reflected by the employment records in evidence as Exhibits 1, 2 and 3. Our analysis of these records reveals that prior to the effective date of Title VII of the

Civil Rights Act (July 2, 1965) Greyhound hired forty-eight whites into Class A jobs (agents) while hiring no blacks into Class A jobs. Prior to the effective date of the Act, Greyhound had hired thirty-one blacks and no whites into Class B jobs (porters).

Since July 2, 1965, Greyhound has hired forty-eight blacks and thirty whites into Class B jobs. Since the effective date of the Act Greyhound has hired twelve new white employees into Class A jobs; eleven were hired as temporary workers during periods of high business volume and only one was hired as a permanent employee who was still with Greyhound at the close of 1971. Though not hiring any new black employees into Class A jobs between July 2, 1965 and the end of 1971, Greyhound did transfer twenty-two employees, seventeen blacks and five whites from Class B to Class A jobs.

As of 1971, there were nine blacks holding Class A jobs. All nine had been originally hired into Class B jobs and all nine had been upgraded to Class A after Title VII became law. Of the nine blacks who occupied Class A positions at the end of 1971, seven, including the plaintiff, had been employed by Greyhound in Class B jobs prior to July 2, 1965. As of 1971 there were three whites employed by Greyhound in Class A who were originally hired as Class B employees subsequent to the Act; however, these three whites made the transfer from Class B to Class A in considerably less time than did the nine blacks.

Two of the nine blacks who now hold Class A jobs with Greyhound maintain seniority with Division 1174 as of the date of their employment by Greyhound because they entered Greyhound's employ outside of New Orleans where they have always been represented by Division 1174. The seven other blacks, including plaintiff, and the three whites who transferred from Class B to Class A jobs maintain their seniority with Division 1174 as of the hour and date of first work performed in Class A and not as of the date of original employment by Greyhound. Seniority in a job classification within the area of Division 1174 determines all bidding rights with respect to all jobs listed by that union. Plaintiff's position on the seniority roster not only affects his bidding rights, but also affects plaintiff with respect to his rate of pay, layoffs, transfers and other terms and conditions of employment.

It is the plaintiff's contention that evidence, particularly the statistical evidence, clearly supports his allegations of racial discrimination in employment on the part of defendants Greyhound, Division 1174 and Local 275. Plaintiff's principal argument in support of his contention is that the present seniority system perpetuates and reinforces the effects of pre-Act racial discrimination.

Greyhound's position is twofold. First it suggests that statistical evidence should not be considered with respect to an individual's Title VII claim since such evidence has only been used to support allegations of class discrimination; secondly, Greyhound contends that the statistical evidence, if relevant, demonstrates Greyhound's compliance with the dictates of Title VII. In addition, Greyhound confesses that it is willing to recognize the date of original continuous employment as the seniority date for all employees, but maintains that its hands are tied by its collective bargaining agreements reached through negotiations with the respective unions.

Division 1174 contends that the seniority system of which plaintiff complains is not racially discriminating and that said seniority system, as a "condition of employment," was lawfully bargained for by the union and Greyhound in conformity with the principles embodied in the National Labor Relations Act. Division 1174 argues that to take any other position would be in breach of its obligation of fair representation of its members to the best of its ability. Local 275 offers little more than a denial of discriminatory practices on its part

and a pat on the back to any of its members who advance to better jobs within the class represented by Division 1174.

■ There is no merit to Greyhound's suggestion that statistical evidence is of no probative value in an individual's Title VII case. The statute makes it an unlawful employment practice for an employer to refuse to hire any individual or to deprive any individual of employment opportunities because of such individual's race. 42 U.S.C. § 2000e–2(a). Discrimination against a class is of course discrimination against *any individual* who is a member of that class. There can be no doubt that statistical evidence is accorded "great and oft-times decisive weight" in "practice or pattern" discrimination cases. Ochoa v. Monsanto Company, 473 F.2d 318 (5th Cir. 1973) citing Rowe v. General Motors Corporation, 457 F.2d 348 (5th Cir. 1972) and United States v. Jacksonville Terminal Company, 451 F.2d 418 (5th Cir. 1971); *see also*, United States v. Georgia Power Company et al., 474 F. 2d 906 (5th Cir. 1973). Statistical evidence of a pattern or practice of discrimination is of probative value in an individual discrimination case for the purpose of showing motive, intent, or purpose. Terrell v. Feldstein Company, Inc., 468 F.2d 910 (5th Cir. 1972). "When seniority becomes an issue, however, the past becomes more important." United States v. Jacksonville Terminal Company, supra, at p. 450. From the statistical evidence presented herein, we find that defendant Greyhound had engaged in pre-Act racial discrimination. Prior to the Act, Greyhound hired whites exclusively into the more favorable Class A positions while it hired blacks exclusively into the less favorable Class B positions. Since the effective date of the Act, Greyhound, obviously in an attempt to comply with the requirements of Title VII, has hired both blacks and whites into Class B positions and has advanced seventeen blacks as compared to five whites from Class B jobs to Class A jobs. Though the hiring of twelve new whites into Class A positions, notwithstanding the fact that eleven of these were temporary employees, as compared to hiring of no new blacks into Class A, is evidence of post-Act discrimination, such discrimination is not relevent to plaintiff's attack on the present seniority system.

■ In order for plaintiff to recover on his theory of the case—that the present seniority system perpetuates pre-Act racial discrimination—there must be a causal relationship between the past discrimination and the seniority system under attack.

"The plaintiffs' theory is essentially an argument that a showing of historical pre-Act racial discrimination alone establishes a per se violation of Title VII. We rejected that theory in United States v. Jacksonville Terminal Co., 451 F.2d 418, 450 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). See also L. Sutter, Current Procedural and Evidentiary Consideration Under Title VII of the Civil Rights Act of 1964: Ready for the Defense, 6 Ga.L.Rev. 505, 516 (1972). In applying Title VII courts have not ended their factual examinations and legal analyses at the point where they find historical evidence of pre-Act, racially discriminatory treatment by the employer. Rather, recognizing that Title VII operates only prospectively, the courts have consistently gone further to scrutinize the etiology, as revealed by the evidence, of the present terms and conditions of employment alleged to violate Title VII. And where they have found a causal nexus between the past discrimination and the challenged present condition of employment, not justified by some 'business necessity' which itself complies with Title VII, the courts have held that the present condition violates Title VII. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Local 189, United Papermakers, etc. v. United States, 416 F.2d 980 (5th Cir.), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); United

States v. Jacksonville Terminal Co., supra, and Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972). Relief has then been granted even in the absence of a showing of present intent to discriminate and even in the presence of a showing of present good intent towards alleged discriminatees." (Footnotes omitted). Peters v. Missouri-Pacific Railroad Company, 483 F.2d 490 (5th Cir. 1973).

■ We find that a causal nexus exists between past discrimination on the part of Greyhound and the seniority system clearly prejudicial to plaintiff. Plaintiff was hired into an all black position and until passage of the Act was unable to achieve a better job within Class A which up until that time had only been available to white employees. Under the present seniority system those employed in Class B cannot compete with Class A employees for the more favorable Class A positions. And once a Class B employee does manage to get a position in Class A, as is plaintiff's situation, said employee's advancement in Class A is impeded in that his seniority acquired with Greyhound while in Class B is lost. Thus, blacks who held traditionally Class B jobs tend to be locked into Class B jobs and when they do manage to move to Class A, their advancement is limited by the present seniority system.

■ And it is no defense that the seniority system, which we find to be in violation of Title VII, is the product of collective bargaining between parties who have fulfilled their obligation of fair representation as imposed by the NLRA. Peters v. Missouri-Pacific R. R. Co., supra, and the authorities cited therein; *see also*, United States v. Chesapeake and Ohio Railway Company, 471 F.2d 582 (4th Cir. 1972). Judge Godbold in *Peters* said:

"Even if the Railroad's intent in agreeing to and enforcing the challenged employment agreement was a racially neutral, or even benevolent, desire to discharge its legal duty to bargain with the plaintiffs' representative and to enforce the contract entered into, such intent does not save the agreement from the terms of Title VII if it operates to 'freeze' the status quo of prior discriminatory employment practices." 483 F.2d at 498.

*Peters* and the authorities cited therein make it unnecessary to further consider the defendants' arguments in support of the collective bargaining defense. We find that the present seniority system, the product of collective bargaining between the defendants, continues the effect of prior racial discrimination in employment in violation of Title VII. United States v. Georgia Power Company, supra. The rights assured by Title VII cannot be bargained away. United States v. Chesapeake and Ohio Railway Company, supra, and cases cited therein.

■ Having found employment discrimination on the part of the defendants, we need only formulate the appropriate relief to which plaintiff is entitled. Of course, the present seniority system must be restructured. By replacing "union seniority" with "company seniority," plaintiff will have his seniority computed from the date of his original employment with Greyhound for purposes of *future* bidding rights on terminal jobs, rates of pay, layoffs, transfers and other terms and conditions of employment affected by seniority. Plaintiff's new seniority will apply only to future job movements in view of the "rightful place" theory adopted in this circuit as a just means of remedying discriminatory seniority systems. United States v. Georgia Power Company, supra; Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969); *see also* United States v. Hayes International Corporation, 456 F.2d 112, at 116 n. 4 (5th Cir. 1972) and Long v. Georgia Kraft Company, 455 F.2d 331, at 334 n. 4 (5th Cir. 1972). Title VII authorizes the imposition upon both the employer and the labor representatives the affirmative duty

of properly implementing plaintiff's "rightful place" seniority. United States v. Jacksonville Terminal Company, supra. The defendants will be enjoined from denying plaintiff his seniority computed from the date of his original employment with Greyhound for purposes of future bidding, rights and other terms and conditions of employment affected by seniority.

█ Plaintiff has also requested relief in the form of back pay and attorney's fees. In an appropriate case back pay may be awarded to a successful complainant and assessed against a Title VII "respondent," whether an employer or a labor organization, who "has intentionally engaged in or is intentionally engaging in an unlawful employment practice." 42 U.S.C. § 2000e–5(g), as amended (1972). Courts in this circuit have held that the phrase "intentionally engaged in an unlawful employment practice" means "only that the defendant meant to do what he did, that is, his employment practice was not accidental." Local 189, United Papermakers & Paperworkers v. United States, supra at 996; *see also*, Rowe v. General Motors Corporation, supra, and LeBlanc v. Southern Bell Telephone and Telegraph Company, 333 F.Supp. 602 (E.D.La. 1971) aff'd 460 F.2d 1228 (5th Cir. 1972).

█ However, we feel that an award of back pay is not warranted under the circumstances of this case. We find that Greyhound maintained a good faith belief that it could do nothing about the seniority structure existing at the New Orleans Terminal because of its collective bargaining agreements with Division 1174 and Local 275. During this litigation Greyhound demonstrated its willingness to recognize the date of original continuous employment as the seniority date for all terminal employees. Furthermore, all Greyhound employees,

both black and white, at its terminals in Baton Rouge, Montgomery and Mobile have their seniority determined by the date of their first employment with Greyhound. This is also evidence of good faith on the part of Division 1174 which represents all terminal employees in Baton Rouge, Montgomery and Mobile. And like Greyhound, both Division 1174 and Local 275 apparently were acting pursuant to what they considered their obligations to be under the NLRA. Relief in the form of back pay has previously been denied in a case where the circumstances were somewhat analogous to those present here. See LeBlanc v. Southern Bell Telephone and Telegraph Company, supra.

█ Title VII expressly provides that the court in its discretion may award reasonable attorney's fees to the prevailing private litigant. 42 U.S.C.A. § 2000e–5(k). Notably, the awarding of attorney's fees is not conditioned on a finding that the Title VII defendant has intentionally engaged in an unlawful employment practice. Reasonable attorney's fees are frequently awarded to private litigants in order to encourage compliance with the well recognized congressional policy of having Title VII enforced to a large extent by individuals acting as "private attorneys general." In view of this policy of citizen enforcement, plaintiff is entitled to an award of reasonable attorney's fees to be assessed against the defendants in solido. [2]

█ Additionally, plaintiff is entitled to recover from the defendants in solido, as special damages, living expenses incurred while working in the Baton Rouge Terminal. [2]

This opinion shall serve as our findings of fact and conclusions of law.

Counsel shall submit to the Court not later than June 30, 1973 a suggested form of decree.

---

2. The parties have stipulated the amounts of $8,000.00 and $500.00 for attorneys fees and special damages, respectively, are reasonable.