**Maria Diaz FARO, Plaintiff-Appellant,**

v.

**NEW YORK UNIVERSITY,
Defendant-Appellee.**

**No. 1216, Docket 74-1041.**

United States Court of Appeals,
Second Circuit.

Argued June 26, 1974.

Decided Aug. 23, 1974.

---

**1230**

Nancy E. Stanley, New York City (Bellamy Blank Goodman Kelly Ross & Stanley, New York City and Diane Serifin Blank, New York City, on the brief), for plaintiff-appellant.

William C. Porth, New York City (Katherine B. Desai, New York City, of counsel), for defendant-appellee.

Carol Lynn Green, Washington, D. C., for the United States Equal Employment Opportunity Commission as amicus curiae.

Before MOORE and FEINBERG, Circuit Judges, and PALMIERI,* District Judge.

MOORE, Circuit Judge:

Plaintiff, Maria Diaz Faro, a doctor of philosophy, Ph.D. in anatomy, not a medical doctor (referred to herein as Dr. Faro), appeals from an order of the District Court denying her application for a preliminary injunction in an action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., wherein she sought an injunction against defendant from allegedly changing her employment status in the New York University Medical Center (for brevity usually referred to as "NYU"), pending action by governmental agencies with which she had filed complaints alleging discrimination against her because she is a woman.

After a three-day hearing, the court (Duffy, J.) denied the preliminary injunction, concluding that it was "thoroughly unconvinced that the defendant University was motivated by sex bias or discrimination in refusing to create a special position for plaintiff and to give that job to her." and, since "the plaintiff has failed to show either irreparable harm or the likelihood of success on the merits," that no injunction should issue.

To appraise the merits of Dr. Faro's claim, the facts relating to her coming to NYU and her position and work there since that time should be reviewed.

Dr. Faro came to NYU in early 1965 from Puerto Rico as one of some fourteen members of a research staff of the Laboratory of Perinatal Physiology, a group brought to NYU by Dr. William F. Windle and which was engaged in primate studies. She was given the status of a research scientist as an Instructor of Experimental Rehabilitation Medicine. Her compensation was from special funds. In 1968 her grade was changed to Assistant Professor and in September 1972 to Associate Professor.

The Department of Rehabilitation Medicine of NYU is frequently referred to as the Rusk Institute because of its founder and chairman, Dr. Howard A. Rusk.[1] The grant under which Dr. Windle and his staff were conducting their research was not a grant in perpetuity. Dr. Windle advised his staff that his grant would terminate in February 1971 and that he was departing about that time. Apparently, all other members of the research group except two women, Dr. Faro and Dr. Barker, left. To aid Dr. Faro in continuing her research, NYU arranged to have her participate in teaching a course in Gross Anatomy in the Department of Cell Biology on a temporary basis in the Spring of 1971 and again from September 1971 to February 1972.[2] In addition, Dr. Rusk was able to secure some funds from private foundations to support Dr. Faro's research activities for a further limited period.

In the summer of 1971, Dr. Rusk wrote to eleven employees of his Department including Dr. Faro, terminating their appointments as of August 31, 1972, and offering new appointments without tenure possibilities but with continuation of current salary and fringe benefits. All except Dr. Faro ac-

---

* Of the Southern District of New York, sitting by designation.

1. For a detailed account of the part Dr. Rusk played in the organization and development of rehabilitation procedures at NYU,

see "A World to Care For: The Autobiography of Howard A. Rusk, M.D." Random House, 1972.

2. Dr. Faro also taught a course in Medical Spanish.

cepted. Dr. Faro chose to regard this as a "demotion" and requested consideration for a tenured position which she was subsequently advised NYU's financial and academic situation precluded. NYU's financial condition (large deficits having been incurred) forced it to terminate Dr. Faro's employment as of December 31, 1973. Dr. Faro sought other academic employment but without success. She decided to attempt to remedy this situation by filing alleged employment discrimination charges with the U. S. Equal Employment Opportunity Commission and the New York City Commission on Human Rights. Because of the anticipated delays before these Commissions, Dr. Faro brought this suit and moved for a preliminary injunction. Primarily her claim is, and of necessity must be, that the action taken by NYU in her case was of a discriminatory nature because she is a woman.

█ The district court did not dispose of the motion on the affidavits alone but granted a protracted hearing (three days) in which Dr. Faro and Drs. Sabatini (Chairman of the Cell Biology Department), Rusk (Director of the Institute of Rehabilitation Medicine and Chairman of the Department of Rehabilitation Medicine), Potter (Associate Dean of the Medical Schools) and Goodgold (Professor of Rehabilitation Medicine and Director of Research and Training in the Institute of Rehabilitation Medicine); all testified. The court's conclusion that there was no discrimination against Dr. Faro is amply supported by the proof—in fact, it is the only conclusion which could be properly adduced therefrom. In argument, Dr. Faro points to the hiring of other medical professors who are male but the proof shows no professional comparison between these professors, their experience, skills and purposes for which they were hired, and Dr. Faro.

Dr. Faro also argues that the district court applied a too stringent standard of proof in denying the preliminary injunction; that the court was in error in stating that she must show a strong likelihood of ultimate success on the merits; that she has shown irreparable injury; and that the issues here, legal and factual, are complex.

Dr. Faro, in effect, envisions herself as a modern Jeanne d'Arc fighting for the rights of embattled womanhood on an academic battlefield, facing a solid phalanx of men and male faculty prejudice. She would compare herself and her qualifications with all recent appointees to the NYU medical faculty and asserts that she is just as competent as they are. In particular, she selects three doctors for comparison. She states that she was offered $4,000 for the same job for which a Dr. Alves was paid $23,000. Of course, as the district court found and the record substantiates, it was not the same job. Analysis of the proof clearly shows that the experience possessed by such male professors as have been hired is not comparable to the limited teaching and research background of Dr. Faro.

By this suit, Dr. Faro seeks a teaching job in any department of the Medical School which keeps her in the tenure chain and provides her with a full-time salary. The fact that, for a person of Dr. Faro's qualifications, there is no such job available apparently is inconsequential.

The faculty selection process has been described by Dr. Rusk as follows:

> Recommendations come from the chairman of the department and then there is a promotions committee within the department made up of senior faculty members who discuss, approve or disapprove these recommendations. From there it goes to the medical center executive committee where it is reviewed by a special promotions committee and then it comes back for approval or disapproval by the subcommittee as a whole.

No one other than the department chairman makes such recommendations.

█ Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments

at a University level are probably the least suited for federal court supervision. Dr. Faro would remove any subjective judgments by her faculty colleagues in the decision-making process by having the courts examine "the university's recruitment, compensation, promotion and termination and by analyzing the way these procedures are applied to the claimant personally" (Applt's Br. p. 26). All this information she would obtain "through extensive discovery, either by the EEOC or the litigant herself" (*Id.*). This argument might well lend itself to a *reductio ad absurdum* rebuttal. Such a procedure, in effect, would require a faculty committee charged with recommending or withholding advancements or tenure appointments to subject itself to a court inquiry at the behest of unsuccessful and disgruntled candidates as to why the unsuccessful was not as well qualified as the successful. This decision would then be passed on by a Court of Appeals or even the Supreme Court. The process might be simplified by a legislative enactment that no faculty appointment or advancement could be made without the committee obtaining a declaratory judgment naming the successful candidate after notice to all contending candidates to present their credentials for court inspection and decision. This would give "due process" to all contenders, regardless of sex, to advance their "I'm just as good as you are" arguments. But such a procedure would require a discriminating analysis of the qualifications of each candidate for hiring or advancement, taking into consideration his or her educational experience, the specifications of the particular position open and, of great importance, the personality of the candidate.

In practically all walks of life, especially in business and the professions, someone must be charged with the ultimate responsibility of making a final decision—even as are the courts. The computer, highly developed though it be, is not yet qualified to digest the punch cards of an entire faculty and advise the waiting and expectant onlookers of its decision as to hiring or promotion. Even were it so capable, a new rule would have to be added to appellate rules entitled "Appeal from a Computer."

■ As to "irreparable harm," Dr. Faro is in no way different from hundreds of others who find that they have to make adjustments in life when the opening desired by them does not open. This situation is not confined to medical schools. Of a hypothetical twenty equally brilliant law school graduates in a law office, one is selected to become a partner. Extensive discovery would reveal that the other nineteen were almost equally well qualified. Fifty junior bank officers all aspire to become a vice-president—one is selected. And, of course, even judges are plagued by the difficulty of decision in selecting law clerks out of the many equally well qualified.

Dr. Faro apparently is convinced "of the sex-bias in higher educational institutions" and that she "must fight the sexism in other institutions of higher learning." A certain well-known Governor of New York frequently and wisely said, "Let's look at the record." So looking, we find that the district court did not confine itself to any one limited set of standards but rather considered all, likelihood of success, irreparable damage, "substantial and difficult" issues and balance of hardships. After considering the law and the facts it found that it was "forced to conclude that the defendant University had treated Dr. Faro fairly and in a manner that was above reproach". The record supports this conclusion. The Court said, "The University's Medical School is presently going through a period of difficult financial strain and officials have explained this to plaintiff [Dr. Faro], pointing out that the circumstances require the termination of her research." After analyzing the facts, it is obvious that "The defendant has been far from heartless in its termination of Dr. Faro. Various officials of the University have attempted to aid her in her search for a

position at another institution but to no avail." (Opinion of Duffy, J.)

The reasons for the termination of Dr. Faro's research project are clear but even clearer is the conclusion that no violation of any provision of Title VII was involved therein.

Order affirmed.