**Marcia R. LIEBERMAN,**
**Plaintiff-Appellant,**

v.

**Edward V. GANT et al.,**
**Defendants-Appellees.**

**No. 1291, Docket 79–7740.**

United States Court of Appeals,
Second Circuit.

Argued June 9, 1980.

Decided July 17, 1980.

Susan R. Meredith, New Haven, Conn. (Connecticut Women's Educational and Legal Fund, Inc., New Haven, Conn., Phyllis Gelman, New Haven, Conn., and John W. Watson, Hartford, Conn., of counsel), for plaintiff-appellant.

Thomas F. Parker, Hartford, Conn. (Gross, Hyde & Williams, Hartford, Conn.), for defendants-appellees.

Before FRIENDLY and MANSFIELD, Circuit Judges.*

FRIENDLY, Circuit Judge:

Plaintiff, Dr. Marcia Lieberman, brought this action in the District Court for Connecticut in April, 1973, against eight officials and professors at and the trustees of the University of Connecticut, a state university. She sought damages and injunctive relief because of the refusal of the University to grant her tenure in the English Department in the academic year 1972–73. She claimed that the adverse decision was made because she was a woman and an advocate of women's rights. After extensive discovery, trial before Chief Judge Clarie began on April 20, 1976. This produced a transcript of nearly 10,000 pages and almost 400 exhibits and consumed 52 days of court time. The docket entries stretch over 32 pages.[1] Trial concluded on May 26, 1978. Briefs were directed to be filed no later than July 31, but the court later granted an extension until March 5, 1979, a deadline which defendants met. Although accorded a further extension until July 13, 1979, plaintiff's trial counsel never filed proposed findings of fact and conclusions of law or a brief. All this has at least some bearing on plaintiff's contentions that still further evidence should have been received.

Despite the difficulties arising from the length of the trial, the long gap between its end and the filing of defendants' brief, and the plaintiff's failure to submit any pro-

posed findings and conclusions or a brief, Chief Judge Clarie, on August 2, 1979, rendered an elaborate 24-page opinion, 474 F.Supp. 848, with which familiarity is assumed, concluding that the complaint should be dismissed. He stated the facts with his usual meticulous care, and we shall not repeat them. We also are in general accord with his rulings of law. We write in order to deal with a few of the claims of error advanced by the plaintiff and also in the hope that an opinion may clarify the tests applicable in cases of this kind and suggest means of avoiding such protracted proceedings as were held in this case.

The central provision of Title VII, 42 U.S.C. § 2000e–2(a), on which Dr. Lieberman principally relies, provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The starting point when a Title VII plaintiff alleges disparate individual treatment under facially neutral policies is the Supreme Court's analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802,

---

* Hon. William O. Mehrtens, Senior District Judge for the Southern District of Florida, sitting by designation, participated in the hearing of this appeal. Judge Mehrtens voted in favor of the disposition herein made, but due to his subsequent illness and death did not have an opportunity to review this opinion. Accordingly the appeal is being disposed of by the other two judges as provided in Second Circuit Rule § 0.14(b).

1. We do not understand how either the federal courts or universities can operate if the many

adverse tenure decisions against women or members of a minority group that must be made each year are regularly taken to court and entail burdens such as those here incurred. This is not the first lengthy trial in a case of this sort. See, e. g., *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328 (W.D.Pa.1977) (dismissing complaint alleging refusal to grant promotion and tenure was discriminatory after 74 days of trial, 12,085 pages of testimony, 73 witnesses and nearly 100 exhibits).

93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), which, although a case of alleged racial discrimination, applies equally, with appropriate changes in terms, to discrimination because of sex:

> The complainant in a Title VII trial must carry the initial burden . . . of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. [Footnote omitted.]

This extract says nothing about the need to prove discriminatory intent; the evident thought was that proof of the four elements warranted an inference of such intent unless the defendant presented at least some evidence in rebuttal.[2]

Applying the *McDonnell Douglas* test, Chief Judge Clarie concluded, 474 F.Supp. at 863–64, that Dr. Lieberman would make out a prima facie case by proving:

> the following four elements: (1) she is a woman; (2) she was qualified for tenure; (3) despite her qualifications, she was rejected; and (4) after her rejection the position remained open and the defendants continued to seek or accept applications from persons of her qualifications.

Dr. Lieberman obviously satisfied elements (1) and (3), and the judge evidently saw no difficulty with respect to element (4) since "males were subsequently granted tenure in the English Department", 474 F.Supp. at 864 n.15.[3]

The judge had more trouble in finding that Dr. Lieberman proved that "she was

---

**2.** Defendants urge that doubt has been cast upon this orthodox interpretation of *McDonnell Douglas* by fn. 15 in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). The Court there stated that in cases of disparate treatment "[p]roof of discriminatory motive is critical" and distinguished such cases from claims of "disparate impact" in which "[p]roof of discriminatory motive, we have held, is not required . . .", comparing *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 32, 91 S.Ct. 849, 853 854, 28 L.Ed.2d 158 (1971) with *McDonnell Douglas*, 411 U.S. 792, 802 06, 93 S.Ct. 1817, 1824 1826, 36 L.Ed.2d 668. Several circuits have attempted to reconcile the *Teamsters* footnote with the *prima facie* case requirements set forth in *McDonnell Douglas* on the ground that the elements of the *prima facie* case give rise to an *inference* of discriminatory motive. In other words, "[p]roof of discriminatory motive is critical," but the elements of the *prima facie* case set forth in *McDonnell Douglas* supply the requisite proof as an initial matter. See *Peters v. Jefferson Chemical Co.*, 516 F.2d 447, 449 50 (5 Cir. 1975); *Alexander v. Gardner-Denver Co.*, 519 F.2d 503, 505 (10 Cir. 1975), cert. denied, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976); *Meyer v. Missouri State Highway Commission*, 567 F.2d 804, 808 (8 Cir. 1977) ("showing of differences in treatment" necessary to establish *prima facie* case under *McDonnell Douglas* "often implies discriminatory intent"), cert. denied, 435 U.S. 1013, 98 S.Ct. 1888, 56 L.Ed.2d 395 (1978); *Chavez v. Tempe Union School Dist. No. 213*, 565 F.2d 1087, 1091 (9 Cir. 1977) ("[a] showing of the four factors identified in *McDonnell Douglas*

raises an inference of discriminatory motive"). Accord, *Smith College v. Massachusetts Commission Against Discrimination*, — Mass. — , 380 N.E.2d 121, 125 (1978) ("although the fact of discriminatory motive must be proved, it can be inferred from differences in the treatment of two groups"). In *Furnco Construction Co. v. Waters*, 438 U.S. 567, 579 800, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1977), the Court seems to have come to this same resolution when it said: "A *McDonnell Douglas* prima facie case . . is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations."

**3.** We too shall assume this in plaintiff's favor, although we do not think it quite so self-evident as did the district judge. Although the record contains no evidence that the University sought applications for the particular tenure position that Dr. Lieberman would have filled, we gather that at the University of Connecticut, in contrast to some others, there are not particular tenure slots; rather all persons on the tenure track who are found sufficiently worthy in the year in which they come up for tenure are given tenure and those who are not must be offered a one-year "terminal" appointment. We need not determine what would constitute a sufficient showing with respect to element (4) in the case of universities with more severe tenure policies.

qualified for tenure." Indeed he indicated, 474 F.Supp. at 864, that but for *Powell v. Syracuse University*, 580 F.2d 1150 (2 Cir. 1978), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1979), he would have found that she was not. Although the *Powell* court upheld the dismissal of Ms. Powell, it did so on the ground that the university had successfully rebutted the *prima facie* case she had made out. It made clear that *Faro v. New York University*, 502 F.2d 1229, 1231–33 (2 Cir. 1974), which it characterized as a "common-sense position", was not to be read as a "policy of self-abnegation where colleges are concerned." [4]

■ We think the judge may have somewhat overread *Powell*, which concerned renewal of a teaching contract rather than appointment to tenure. In contrast to an ordinary teaching position, terminable at the end of any academic year, and in still greater contrast to employment as a bricklayer as in *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7 Cir. 1977), on which the *Powell* court relied, advancement to tenure entails what is close to a life-long commitment by a university,[5] and therefore requires much more than the showing of performance "of sufficient quality to merit continued employment" which the Seventh Circuit held enough in the case of the bricklayer in *Flowers*. The policies of the University of Connecticut, like those of most universities, prescribe qualifications for tenure that are considerably higher than those for the making or renewal of an appointment. The Laws and By-Laws of the University stated

Policies for promotion should operate to advance the most promising, and to hold

back, or, in accordance with established practices regarding tenure, to eliminate the incompetent and the mediocre. Laws and By-Laws Art. X-K-10-a. (PX-1 p. 37).

As Vice President Wilson explained in an April 21, 1969 memorandum to the faculty long before Dr. Lieberman's case arose:

When in doubt, don't. Since the tenure decision is a commitment by the University to twenty or thirty years of support and several hundred thousand dollars of salary, from which there can be no turning back, we have felt that if we must err, we ought to err on the side of caution; we ought not to gamble widely. (PX-66 p. 3) (emphasis in original).

Under such appropriately rigorous standards, a candidate for tenure does not make out the elements needed for a *prima facie* case merely by showing qualifications for continuation as an untenured faculty member; indeed to hold that he did would be in effect to negate the requirements beyond minimally satisfactory performance properly entering into the tenure decision. See *Labat v. Board of Education of the City of New York*, 401 F.Supp. 753 (S.D.N.Y.1975) (Weinfeld, J.) (plaintiff alleging that denial of tenure was racially motivated "assumes one of the four elements . . . used to establish a prima facie case, to wit, that he 'was qualified for [the] job'—the very issue presented to the defendants") (quoting *McDonnell Douglas*) (brackets supplied by the court). However, since any error by the trial judge in finding that Dr. Lieberman had made out a *prima facie* case operated in her favor, we need not discuss the issue further.

---

4. Judge Moore, the author of the unanimous opinion in *Faro*, wrote a concurring opinion in *Powell* in which he also disclaimed any intention of the *Faro* court to abdicate judicial responsibility with respect to universities but emphasized the serious difficulties faced by courts "in attempting to evaluate the ability of a faculty member." 580 F.2d at 1157.

5. The by-laws of the University of Connecticut provide that "termination of an appointment with continuous tenure . . . may be effected by the institution only for adequate cause." Laws and By-Laws Art. X-K-4-a. This

standard is identical to the one suggested in the "1972 Recommended Institutional Regulations on Academic Freedom and Tenure" of the American Association of University Professors. Neither document contains a more precise definition of adequate cause, but the University of Connecticut by-laws, like the suggested regulations, specify elaborate procedures that must be followed prior to a dismissal, Art. X-K-5, and place the burden of proof on the issue of adequate cause on the shoulders of the University, Art. X-K-5-d(6).

*McDonnell Douglas* stated that once an employee complaining of disparate treatment has made a *prima facie* case, "[t]he burden must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection", 411 U.S. at 802, 93 S.Ct. at 1824, after which the plaintiff "must . . . be afforded a fair opportunity to show that [the employer's] stated reason for [the plaintiff's] rejection was in fact pretext." *Id.* at 804, 93 S.Ct. at 1825. In *Furnco Construction Co. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978), the Court later stated that "[t]o dispel the adverse inference from a prima facie showing under *McDonnell Douglas*, the employer need only" articulate such a reason. Despite these statements, in *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169, 177 (1 Cir. 1978), which involved refusal to promote an already tenured associate professor to a full professorship, the First Circuit spoke in one part of its opinion of "requiring the defendant to prove absence of discriminatory motive" and said that in imposing this requirement the Supreme Court had "placed the burden squarely on the party with the greater access to such evidence." The Supreme Court quickly repudiated this misinterpretation of *McDonnell Douglas* in *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n.2, 99 S.Ct. 295, 297 n.2, 58 L.Ed.2d 216 (1978). The Court perceived "a significant distinction between merely 'articulat[ing] some legitimate, nondiscriminatory reason' and 'proving absence of discriminatory motive.' " The latter requirement would place on the employer at the second stage of the *McDonnell Douglas* process "the burden of

showing that the reason for the rejection was not a pretext, rather than requiring such proof from the employee as a part of the third step." 439 U.S. at 24–25 n.1, 99 S.Ct. at 295 n.1. The Court therefore remanded for reconsideration in the light of *Furnco*.[6] What is most significant in *Sweeney* is that all nine Justices agreed that "under *Furnco* and *McDonnell Douglas* the employer's burden [in the second phase of the case] is satisfied if he 'simply explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons,' " 439 U.S. at 25 n.2, 99 S.Ct. at 296 n.2 (quoting the dissenting opinion of Mr. Justice Stevens for four Justices), *id.* at 28, 29, 99 S.Ct. at 297 [brackets supplied by majority].

It is enough for the defendants in the second phase of the case to bring forth evidence that they acted on a neutral basis. They do not have the burden of establishing that their basis was sound;[7] rather the burden then falls on the plaintiff to demonstrate that it is pretextual. One way of doing this, of course, would be to show that the asserted neutral basis was so ridden with error that defendant could not honestly have relied upon it.

Under our reading of *Sweeney*, the defendants here could have sustained their burden of going forward at the second stage of the case simply by calling a knowledgeable witness who would testify, with whatever supporting evidence was deemed desirable, that the denial of tenure to Dr. Lieberman was based on the belief that she had not demonstrated the high degree of scholarship necessary for the award of tenure.[8] Then, at the third stage, she would

---

**6.** After the remand to the Court of Appeals and a further remand to the district court, both courts adhered to their decisions in favor of Dr. Sweeney, the Court of Appeals relying largely on the "unless clearly erroneous" rule. 604 F.2d 106 (1 Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980).

**7.** Despite the seeming clarity of *Sweeney* the Fifth Circuit has adhered to its view that the defendant in a disparate treatment case must "prove nondiscriminatory reasons by a preponderance of the evidence." *Burdine v. Texas Department of Community Affairs*, 608 F.2d

563, 567 (1979). Certiorari has been granted on the defendant's request, U.S. ——, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980).

**8.** In this case the defendants may have made the necessary rebuttal even earlier, during their cross-examination of plaintiff's own witnesses, see 474 F.Supp. at 872 (quoting testimony of Professor Joan Hall, one of plaintiff's advocates, to the effect that no one who voted against tenure thought that Dr. Lieberman was sufficiently qualified to deserve it). See *Sime v. Trustees of California State Universities & Colleges*, 526 F.2d 1112, 1114 (9 Cir. 1975);

have had the burden of showing that this was a pretext to mask what she claimed to be the true reason for the denial of tenure, namely, her sex. At the end of the third stage, defendants could, if they chose, move for an involuntary dismissal pursuant to Fed.R.Civ.P. 41(b) and would thus be required to present evidence that their asserted reason was not a pretext only if this motion were denied.

Here the defendants, in the second phase of the case, went far beyond what was required of them. See 474 F.Supp. at 865. We need merely tick off the topic heads of the evidence elaborated by the district court: Dr. Lieberman's original hiring as a lecturer in 1967, when the University was eager to recruit her husband, despite a dossier which would barely have qualified her for an interview; the unanimous refusal in 1968, on the basis of an examination of her Ph.D. dissertation, to give her a tenure-track appointment; the similar refusal in 1969; her gaining admission to the tenure track in 1970, with a rating of 13 out of 15 potential candidates, only because the 12 people who ranked above her had refused; her own doubts at that time about her capacity, as witnessed by her request, contrary to general practice, that her first three years of teaching not be counted toward the probationary period so that she might have an additional six years to prove herself; the advice given her by the promotion and tenure committee in the spring of 1971 to attempt to improve both her teaching and her scholarship in order that she might ultimately merit tenure; a warning from the dean on May 5, 1972, that her scholarship to date was inadequate, and a similar warning from the promotion and tenure committee in the spring of 1972; the advice given her, also during that spring, by Chairman Moynihan of the English Department, who had constantly gone out of his way to help her, in answer to her objection that she had written a sufficient number of scholarly articles, that the trouble was quality and not quantity, and that she must write one essay that would convince the committee of the quality of her mind; the careful consideration given her tenure application in 1972–73, at all levels—the promotion and tenure committee, the "joint committee", the tenured department faculty, the dean's advisory council, the central administration, and the board of trustees, with never a sufficient favorable vote.[9] There was overwhelming evidence that, whatever might be said of Dr. Lieberman's teaching,[10] the participants in the tenure decision had ample basis for honest belief that her scholarship did not measure up to the properly stringent requirement for tenure.

Flowers, supra, 552 F.2d at 1281; Frausto v. Legal Aid Society of San Diego, Inc., 563 F.2d 1324, 1328 (9 Cir. 1977).

9. These efforts included Chairman Moynihan's submission of certain of plaintiff's articles to two distinguished professors (one a woman) at other universities in an endeavor to obtain opinions that would be above any personal considerations. The results were negative.

10. The evidence showed that the tenure and promotion committee had early reached a conclusion that Dr. Lieberman's scholarship was so weak that her only chance for tenure would be a superlative teaching record. Teachers at the University of Connecticut are given numerical ratings by students; we were told at argument that this was done after examinations are graded. Until the ratings for the spring semester of 1972, plaintiff's cumulative rating was only 6.72. Dr. Lieberman places great stress on the point that although the promotion and tenure committee waited for the spring 1972 ratings, it failed to give adequate weight to her improvement in that semester to 8.18, which raised her cumulative rating to 7.06 and placed her 12th out of the 15 junior faculty members. However, even the 8.18 rating was in the lower range of what was considered to be "outstanding". Moreover, the committee was not required to disregard that the cumulative rating was still below average. Beyond all this, student ratings, particularly when rendered after grading, are by no means a perfect index of teaching ability. More weight can appropriately be given to observations by other teachers. In this case, despite the fact that University of Connecticut teachers are advised of forthcoming peer visits, the two committee members who visited Dr. Lieberman's classes found her teaching to be "all right" or "average". As the trial judge said of these reports and the observations of other faculty members, "None of these appraisals can be classified as unmitigated praise, such as would overcome a weak record of scholarship". 474 F.Supp. at 866.

Dr. Lieberman thus had a formidable task in endeavoring to show that the asserted reason for denial of tenure, here not merely "articulated" but substantially established, was a pretext. It was rendered still more formidable by the statements of participants in the tenure decision—not only those who had voted against tenure but some of those who had voted for it, that they did not believe anyone had voted against tenure although believing Dr. Lieberman's record entitled her to it.

■ It is against this background that we must consider Dr. Lieberman's two principal objections—that the judge improperly excluded "comparative evidence" and "statistical evidence". The bulkiest item of "comparative evidence" consisted of 17 folders of male faculty members who had received tenure and, in some cases, appointments as full professors.[11] Plaintiff had prepared from the folders abstracts comparing her qualifications and those of successful males in each area in which a judgment was made—teaching, scholarship, and service to the University. Plaintiff claims that such evidence was relevant to the issue of pretext in the same fashion as the possible evidence, mentioned in *McDonnell Douglas, supra*, 411 U.S. at 804, 93 S.Ct. at 1825, that "white employees involved in acts against petitioner of comparable seriousness to the 'stall-in' were nevertheless retained or rehired," 411 U.S. at 804, 93 S.Ct. at 1825, whereas the black plaintiff was not.

■ The comparative evidence offered in this case is a far cry from the comparative evidence to which the court referred in

*McDonnell Douglas.* Title VII does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory. When a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn. Indeed, to infer discrimination from a comparison among candidates is to risk a serious infringement of first amendment values. A university's prerogative " 'to determine for itself on academic grounds who may teach' " is an important part of our long tradition of academic freedom. *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., joined by Harlan, J., concurring in the result) (citations omitted). See generally Note, Academic Freedom and Federal Regulation of University Hiring, 92 Harv.L.Rev. 879 (1979). Although academic freedom does not include "the freedom to discriminate", *Powell, supra*, 580 F.2d at 1154, this important freedom cannot be disregarded in determining the proper role of courts called upon to try allegations of discrimination by universities in teaching appointments. The Congress that brought educational institutions within the purview of Title VII could not have contemplated that the courts would sit as "Super-Tenure Review Committee[s]", *Keddie v. Pennsylvania*, 412 F.Supp. 1264, 1270 (M.D.Pa.1976); their role was simply to root out discrimination.[12] Chief Judge Clarie thus did not err

11. The votes against Dr. Lieberman's promotion to full professor had been overwhelming and included those of a number of persons who favored tenure.

12. As the Third Circuit has recently said:
    Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are sub-

jective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.
*Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3 Cir. 1980). The district court had found sex discrimination because of the failure to warn Ms. Kunda that a master's degree was required for tenure as a professor of physical education although such warnings had been given to males. Although the court of appeals

in declining plaintiff's invitation to engage in a tired-eye scrutiny of the files of successful male candidates for tenure in an effort to second-guess the numerous scholars at the University of Connecticut who had scrutinized Dr. Lieberman's qualifications and found them wanting, in the absence of independent evidence of discriminatory intent or a claim that plaintiff's qualifications were clearly and demonstrably superior to those of the successful males, a claim which was not made by Dr. Lieberman because it could not have been substantiated.

The studies drawn from the raw files were properly excluded for another reason as well. The studies, which purported to show that plaintiff's qualifications in various areas were superior to those of persons granted tenure, were made in such a manner as to destroy any relevancy they might otherwise have had. With one possible exception, they did not provide a complete comparison between Dr. Lieberman and any of the male candidates; they showed at most that tenure had been granted to some males with no better teaching records and perhaps to some with no better records in scholarship, but these were not the same persons, with the one possible exception of William Sheidley. Plaintiff's own study thus showed the irrelevancy of the files; they proved only that plaintiff, who was neither an outstanding scholar nor an outstanding teacher, had been treated less well than males who were outstanding scholars or outstanding teachers. With respect to Sheidley, whom plaintiff considered to be the most comparable case, the ratings on all three of the factors considered—scholarship, teaching and service to the University—were distinctly better than Dr. Lieber-

man's. Beyond this the judge, in excluding the files and the excerpts, made it clear that they might be used in the cross-examination of Chairman Moynihan, the author of most of the evaluations, which they were not. The judge's rulings excluding the comparative evidence were thus within the discretion conferred upon him by F.R.E. 403 and 404.[13]

The statistical evidence claimed to have been erroneously excluded consisted of two items. One of these was an 18-page report (the so-called Organization Report) entitled "On the Status of Faculty and Professional Women at the University of Connecticut", which had been written by a group called The University of Connecticut Organization of Faculty and Professional Women, of which Dr. Lieberman was co-chairwoman.[14] The court also excluded six annual University reports showing salary differentials between men and women faculty members. Significantly, the following items of evidence *were* admitted: (1) charts listing the salaries of men and women holding junior tenure track appointments in the English Department from 1967–68 through 1973–74 and junior one-year appointments from 1967 to 1970, and (2) a chart showing the employment history of persons hired in the English Department between 1966–67 and 1970–71, i.e., showing when they received tenure, resigned, were terminated, or were given terminal appointments. There was thus no general bar against appellant's introducing statistical evidence of a pattern of sex discrimination in the English Department.

■ Evidence of general patterns of discrimination by an employer is relevant even in an individual disparate treatment case.

there directed the grant of tenure on Ms. Kunda's obtaining a master's degree, it noted that:
The distinguishing feature in this case is that Kunda's achievements, qualifications, and prospects were not in dispute.
*Id.* This is in sharp contrast to Dr. Lieberman's situation.

13. The court also excluded testimony that a particular applicant had been promoted to full professor allegedly "in part upon the basis of publications which did not exist and addresses

which were never given, a fact which could easily have been discovered by reasonably diligent scrutiny of his work . . .". In fact the writings existed and were read by the reviewing committee. The relevancy of this evidence was minimal at best.

14. The Report was admitted, but only to show plaintiff's activities on behalf of women, not for the truth of its contents.

In remanding to the district court in *McDonnell Douglas*, the Court listed the employer's "general policy and practice with respect to minority employment," 411 U.S. at 804–05, 93 S.Ct. at 1825 (footnote omitted), as evidence that "may be relevant to any showing of pretext," 411 U.S. at 804, 93 S.Ct. at 1825, explaining that "statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks." 411 U.S. at 805, 93 S.Ct. at 1825. The Court noted that such evidence might include the racial composition of the employer's workforce, though adding a caveat, especially pertinent here, about the weight this sort of evidence deserves:

> "We caution that such general determinations, while helpful, may not be in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason for refusing to rehire." 411 U.S. at 805 n.19, 93 S.Ct. at 1826 n.19.

The Court's instructions have been frequently followed. See, e. g., *Marquez v. Omaha District Sales Office*, 440 F.2d 1157, 1160–62 (8 Cir. 1971); *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 832–34 (8 Cir. 1977), cert. denied, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); *Carey v. Greyhound Lines, Inc.*, 380 F.Supp. 467, 472 (E.D.La. 1973), affirmed in part, reversed and remanded in part, vacated and remanded in part, 500 F.2d 1372 (5 Cir. 1974).

■ The district court was justified in excluding the Organization Report. Even if the information it contained could have been verified, which was not at all clear, the Report was in any event filled with statements that had nothing at all to do with the University of Connecticut,[15] much less the English Department, as well as masses of irrelevant data.[16] The only figures concerning the English Department that were not otherwise in the record were that only 11.9% of the English Department were women whereas 31% of the nation's Ph.D.'s in English were female. Whatever probative value those figures might have had, the court was not bound to admit the entire haystack simply because it contained a single needle. Moreover, any adverse inference from the excluded evidence was effectively dispelled by proof that when Moynihan was appointed head of the English Department in 1966 there were only 2 women out of 43 people, or 4.6%, whereas in 1972, when the tenure decision was made with respect to Dr. Lieberman, the figures had risen to 8 out of 52, or 15.4%. As the district court pointed out, this meant that of the 9 new positions created during Moynihan's chairmanship, two-thirds had been filled by women. 474 F.Supp. at 871. Also, of the 25 persons given "tenure track" appointments between 1966–67 and 1970–71, 6 were women.

We need not decide whether the exclusion of the evidence purporting to show some minor salary discrimination by the University was improper. This would be very doubtful since evidence of salaries in the English Department was admitted. Beyond this, any error was harmless in light of the compelling evidence that the reason for the defendants' denial of tenure to Dr. Lieberman was completely neutral.

■ The only other claim warranting discussion is Dr. Lieberman's contention that the denial of tenure was in retaliation for her efforts to improve the status of women at the University of Connecticut, both generally and by successful efforts to gain access by them to the University's main athletic facility. This claim if substantiated might be actionable under 42 U.S.C. § 1983 as a denial of Dr. Lieberman's First Amend-

---

15. E. g., the statements of two prominent women, one made in 1935 and the other in 1966, that women were the victims of bias in higher education.

16. E. g., that a young woman had applied to the Economics Department in the winter of 1970–71 but that her application had not been answered, avowedly because of a policy of not answering unsolicited applications, although the writer of the Report thought that her *curriculum vitae* merited an interview.

ment rights and under 42 U.S.C. § 2000e–3(a) as discrimination because of opposition to an unlawful employment practice. But there was scarcely a scintilla of evidence to support a connection between jocular remarks by male professors with respect to Dr. Lieberman's having "taken away" their locker room and the carefully studied and well grounded tenure decision.

Denial of tenure, after six years of employment in a university department, is necessarily a traumatic experience. But it is a simple fact of university life that not every appointee to the rank of assistant professor, even one who may possess some degree of qualification, can be given tenure. See *Kunda v. Muhlenberg College, supra*, at 554 (Garth, J., concurring and dissenting). To award tenure to marginally qualified candidates would block the road to advancement for more highly qualified prospects who may be coming down the tenure track in the future and seriously impair a university's quest for excellence as distinguished from mere competence. The record here completely negates the claim that Dr. Lieberman was denied tenure because of her sex; it indicates rather that foreknowledge of the possibility of her making such a claim caused the decisionmakers to give her every possible consideration—not to make a record but in the hope that they would find sufficiently favorable factors to warrant a decision in her favor. Dr. Lieberman has had full and fair consideration by the authorities of the University of Connecticut and by a conscientious and able judge.

The judgment in favor of the defendants is affirmed.