896 F.2d 1369
 53 Fair Empl.Prac.Cas. 624
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Helen PETERSON, Plaintiff-Appellant,
v.
KING TREE CENTER, Defendant-Appellee.
 No. 89-3522.
 United States Court of Appeals, Sixth Circuit.
 March 1, 1990.
 
 Before BOGGS and ALAN E. NORRIS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 On March 9, 1987, Helen Peterson sued her former employer, the King Tree Center, Inc. (King Tree), in Dayton, Ohio. She alleged that King Tree terminated her on March 24, 1986 for racially discriminatory reasons, in violation of 42 U.S.C. Sec. 1981 (Sec. 1981) and 42 U.S.C. Sec. 2000e (Title VII). Peterson alleged that King Tree discharged her because of her race and in retaliation for filing a claim with the Ohio Civil Rights Commission and that King Tree subjected her to harassment from July 22, 1985 to March 24, 1986. The district court, 722 F.Supp. 360, granted King Tree's motion for summary judgment on all claims. We affirm.
 
 
 2
 * From August 29, 1983 to March 24, 1986, Peterson, a Black woman, was employed as the Director of Medical Records at the King Tree Nursing Home. Charles Ronkin was King Tree's chief administrator from August 29, 1983 to July 22, 1985, and William Hilkert was chief administrator from July 22, 1985 to at least March 24, 1986, when Peterson was terminated for not adequately performing her job.
 
 
 3
 King Tree provides nursing care for the elderly. Peterson, certified as an Accredited Record Technician, was responsible for maintaining all medical records at the nursing home. While Peterson was employed at King Tree, she was the only Black director on the staff. Tensions between Peterson and the King Tree administration mounted after the Ohio Department of Health inspected the facility between March 19 and March 28, 1985.
 
 
 4
 In its report, the Ohio Department of Health noted numerous violations of the state's licensing regulations and recommended revoking King Tree's license. The inspectors cited violations in all departments at King Tree--Nursing, Social Services, Dietetic Services, Physician Services, and Medical Records. The Medical Records department was cited for incomplete record keeping. Peterson asserts that the record keeping problem lay with the administrators in charge of Nursing, Dietary, and Social Services, not with her. Nowhere in the report is the Director of Medical Records personally cited for failure to complete medical records.
 
 
 5
 As a result of its poor evaluation and the threat of license revocation, King Tree terminated several unsatisfactory employees, mostly in the nursing department, during the summer of 1985. Overall, nine administrators, all white, and sixteen nurses, thirteen of whom are white and three of whom are Black, were discharged as a result of the inspection.
 
 
 6
 On October 16, 1985, Peterson had a meeting with Hilkert at which he told her that she had an attitude problem. According to Hilkert's record of the meeting, Peterson agreed and promised to work to correct the problem. In November 1985, Peterson filed a charge against King Tree with the Ohio Civil Rights Commission (an EEOC charge) alleging race discrimination for King Tree's failure to give Peterson more than a $.25 per hour raise.[1]
 
 
 7
 On November 19, 1985, Peterson presented Hilkert with a survey of salaries of other Accredited Record Technicians in other nursing care facilities to support her request for a raise. The salary survey indicated, however, that Peterson was being paid above the average for Directors of Medical Records in the Dayton area. Of the Accredited Record Technicians at eight nearby facilities, only three were being paid more than Peterson. On February 5, 1986, Peterson voluntarily withdrew the EEOC charge, and King Tree received notice of this withdrawal about February 25, 1986.
 
 
 8
 On March 4, 1986, King Tree brought in a Quality Assurance Team to examine the facility, in anticipation of another state inspection. The team included three people: Claudia Rossetti, a medical records consultant; John Hupp, vice-president of Emery Medical Management, Inc. (Emery), the parent company of King Tree Center, Inc.; and Linda Peoples, also employed by Emery. On March 7, 1986, Rossetti informed Peterson that her performance was unacceptable. Rossetti found that Peterson failed to: (1) have physician orders noted or signed; (2) document pharmacy review; (3) maintain quarterly progress notes; (4) maintain personal effects sheets; (5) tag charts for physician signatures; (6) maintain complete physician progress notes; (7) maintain signed and dated telephone orders; (8) record the month, date and year on all documentation; and (9) maintain quarterly updates on Plans of Care for patients. The Quality Assurance Team found all departments except Medical Records to be in order.
 
 
 9
 On March 24, 1986, Rossetti returned to King Tree to assess the progress Peterson had made in correcting the deficiencies that Rossetti had pointed out to Peterson on March 7. Rossetti found that virtually no improvements had been made. Based on Rossetti's evaluation and because of Peterson's failure to make any of the suggested improvements, Peterson was discharged on March 24. Peterson's duties were assumed thereafter by Patient Assessment Nurse Patricia Stockman, who is white. Stockman did not assume Peterson's title.
 
 
 10
 In her role as Director of Medical Records, Peterson could not complete the records herself or order medical personnel to complete records. She was expected to encourage the physicians and other staff to provide the necessary information. It was Peterson's responsibility to pursue the completion of all medical records. King Tree claims that it was Peterson's fault that the medical records were not complete and up to date during her tenure. Peterson claims to have complained incessantly to Hilkert about the failure of others to complete the records, but Hilkert offered no assistance in ordering cooperation.
 
 
 11
 It became apparent in 1985 that Peterson was having difficulty getting the records completed. On October 16, 1985, Peterson received her annual performance review. The evaluation indicates that Peterson had a communication problem with members of the nursing department because of her abrasive manner. She agreed to commit herself to improving her attitude and to eliminating the communication problems. The performance review included an "employee appraisal" form, on which Peterson was rated as average or higher in all areas (ranging from quality of work to dependability to technical knowledge) except cooperation, where she was considered only a "fair team worker." King Tree considered this a "relatively negative performance review," for which Peterson received only a $.25 per hour pay raise.
 
 
 12
 King Tree asserts that it fired Peterson because she failed to perform her duties--a legitimate, non-discriminatory reason. Peterson asserts that the incomplete work was the responsibility of other employees over whom she had no control. These other employees were white and were not disciplined or discharged for their failure to complete the records.
 
 
 13
 In granting King Tree's motion for summary judgment, the district court found that Peterson had made out a prima facie case of discrimination but that she could not prove that King Tree's reason for her termination was pretextual. Citing Daniels v. Board of Education of Ravenna City School, 805 F.2d 203, 207 (6th Cir.1986), Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), the district court held that Peterson could not provide evidence sufficient to support her claim of racial discrimination under either Sec. 1981 or Title VII. We agree.
 
 II
 
 14
 * Peterson first argues that there is sufficient proof to find that King Tree's reason for discharging her was a pretext for a racially based termination. King Tree does not argue on appeal that Peterson did not establish a prima facie case of race discrimination. The district court, in analyzing Peterson's claim under McDonnell Douglas, found that she is a member of a minority, she was qualified for her position, she was subject to an adverse employment action, and her duties, although not her title, were assumed by a white employee. The parties disagree over the next stage of proof: whether there was a genuine issue of material fact as to the legitimacy of King Tree's reason for terminating Peterson.
 
 
 15
 King Tree claims that it discharged Peterson because of the inadequacies in the Medical Records department. These inadequacies, which were Peterson's responsibility, placed King Tree's state license in jeopardy. Peterson argues that there is a material issue as to whether those inadequacies were her responsibility and that, therefore, the district court erred by granting King Tree's motion for summary judgment.
 
 
 16
 Peterson's chief argument is that the district court ignored the fact that, in doing her job, Peterson was completely dependent on the cooperation of other department heads; that she complained to Hilkert that she was not receiving any cooperation, but Hilkert did not help her; that she had no supervisory authority over other directors and no means to compel them to complete the records; that Hilkert refused to implement Peterson's suggestions for improving record keeping; and that she had no problems with other employees until Hilkert became the administrator, as evidenced by the excellent review she received from Ronkin on August 28, 1984.[2] Peterson claims that the obstacles she confronted during Hilkert's tenure support an inference that King Tree fabricated an excuse to fire her.
 
 
 17
 Peterson further argues that this excuse for her discharge was discriminatory. No white director or employee was reprimanded or terminated for failure to complete departmental records. Hilkert allegedly refused to greet or speak to Peterson when he first came to work at King Tree, although he greeted all white employees. Peterson asserts that this behavior constituted disparate treatment.
 
 
 18
 Peterson contests the district court's holding that she failed to present sufficient evidence of pretext. The district court stated that Peterson's only evidence was that she was the only Black administrator; that she had been snubbed by Hilkert; and that Hilkert was more favorably predisposed toward her white colleagues. Peterson argues that the district court failed to take into account the evidence of her having been saddled with performing the responsibilities of other employees. King Tree and Hilkert allegedly shifted to Peterson the task of completing (as opposed to merely monitoring) records from all departments, without giving her the authority to do so.
 
 
 19
 This allegation, even if true,[3] does not constitute proof of intentional race discrimination. Peterson offers no evidence to support her claim that a transfer of responsibilities from other employees to her was motivated by racial animus. Peterson does assert that no white directors were discharged or disciplined for failure to complete records. She cannot prove, however, that the white directors, rather than she, were responsible for overseeing the defective records.
 
 
 20
 Under the McDonnell Douglas-Burdine framework, King Tree did not have to prove that its reason for terminating Peterson was legitimate and non-discriminatory; it merely had to present proof of a legitimate reason, after which it became Peterson's responsibility to prove pretext. As we stated in In re Lewis, 845 F.2d 624 (6th Cir.1988), "[the defendant] does not have to establish that the basis on which it acted in firing [plaintiff] was sound; rather, [plaintiff] has the burden of demonstrating that [defendant's] stated reasons are pretextual." Id. at 633 (emphasis in original). Peterson could have shown pretext directly by demonstrating that a discriminatory reason more likely motivated King Tree or indirectly by showing that King Tree's explanation was incredible. See Daniels v. Board of Education of Ravenna City School, 805 F.2d at 207. In making her case with indirect evidence, Peterson would have had to show that King Tree's "business judgment was so 'ridden with error that defendant could not honestly have relied upon it.' " In re Lewis, 845 F.2d at 633 (quoting Lieberman v. Grant, 630 F.2d 60, 65 (2d Cir.1980)). Peterson cannot prove that King Tree's reason for her discharge was "unworthy of credence." Texas Department of Community Affairs v. Burdine, 450 U.S. at 256.
 
 
 21
 Peterson claims that other employees were not cooperating with her in completing records and that, without the authority to compel them to complete the records, she could not reasonably be expected to maintain the records properly. The record, however, contains no specific contemporaneous complaints by Peterson that her colleagues were not cooperating with her requests.[4] The record contains no evidence that Peterson made any efforts to correct the deficiencies that Rossetti pointed out in March 1986.
 
 
 22
 Peterson's excuses for not performing her duties do not help to establish pretext. As we held in Irvin v. Airco Carbide, 837 F.2d 724, 726 (6th Cir.1988), "disputation of the facts underlying [defendant's] legitimate business reason ... is not sufficient to carry appellant's burden."
 
 
 23
 Hilkert's poor treatment of Peterson likewise is not proof of pretext. It was Sidney Garfield, the president of Emery, not Hilkert, who fired Peterson. Furthermore, allegations that the employer may have treated her badly do not constitute proof of pretext. In Shah v. General Electric Co., 816 F.2d 264, 271 (6th Cir.1987), we held that complaints such as a supervisor's unwillingness to shake the plaintiff's hand or answer his memos, considered in the light most favorable to the plaintiff, did not "raise an inference of discrimination."
 
 
 24
 King Tree asserts that the undisputed evidence shows that Peterson suffered no disparate treatment. In 1985, the state inspectors found numerous deficiencies in King Tree's record keeping. In its attempt to cure the problem, King Tree fired nine administrators, all white, and sixteen nurses, thirteen of whom are white.[5] The Quality Assurance Team inspected the nursing home on March 3 and 4, 1986 and found deficiencies still to exist. Three weeks later, Rossetti, a member of the inspection team, found that Peterson did not correct the problems. Peterson does not refute these facts, but rather denies responsibility for completing the records. King Tree admits that medical personnel are responsible for completing the records but asserts that Peterson was responsible for ensuring, through proper follow-up procedures, that her colleagues completed those records. We find Peterson's argument that King Tree transferred other employees' record-completing duties to her, in order to blame her for the inadequacies, to be unsupported by the facts and insufficient to prove that the reason for her discharge was pretextual.
 
 B
 
 25
 Peterson next argues that her discharge was retaliatory and hence illegal. Peterson claims that the only reason she was discharged in March 1986 was because she had filed an EEOC charge against King Tree with the Ohio Civil Rights Commission. About February 26, 1986, King Tree received a notice that Peterson had withdrawn her charge on February 5, 1986. On March 3 and 4, 1986, King Tree brought in its handpicked Quality Assurance Team, whose report formed the basis for Peterson's discharge.
 
 
 26
 Peterson claims that if King Tree truly fired her for her inadequate record keeping, it could have done so in 1985, after the state inspection revealed incomplete records. Instead, not until after Peterson filed her civil rights claim in November 1985 and then removed the threat against King Tree by withdrawing the claim in February 1986 did King Tree begin finding her work unsatisfactory.
 
 
 27
 Peterson points out that she conducted audits of the records beginning in September 1985. She kept a log listing those departments whose records were incomplete and presented weekly deficiency reports to her superiors. The 1986 inspection report submitted by the Quality Assurance Team only corroborated what King Tree already knew from Peterson's weekly audits. Peterson claims that if King Tree were holding her responsible for the completion of the records, then King Tree should have informed her as early as the fall of 1985 that her performance was deficient. Instead, King Tree waited until after Peterson had withdrawn her EEOC charge to chastise her and then fire her for her failure to complete records over which Peterson claims to have had no control. Peterson argues that the brief, one-week lapse between King Tree's receiving notice of her withdrawal of the EEOC charge and its ordering an inspection of the records compels an inference of retaliation.
 
 
 28
 We hold that the timing of Peterson's discharge is insufficient to raise an inference of retaliation. King Tree asserts that it decided to terminate her employment only after Peterson failed to correct the medical record deficiencies discovered in the March 3 and 4, 1986 inspection. Prior to March 24, 1986, when Rossetti checked on Peterson's progress in correcting the problems, King Tree did not know the extent of Peterson's failure to perform her duties. As we have held, "the mere fact that [plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation." Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir.1986).
 
 C
 
 29
 King Tree argues on appeal for the first time that Peterson's claim is not actionable under Sec. 1981. During the interim period since Peterson filed her notice of appeal, the Supreme Court decided Patterson v. McLean Credit Union, 109 S.Ct. 2363 (1989). In Patterson, the Court held that Sec. 1981 prohibits racial discrimination only in the making or enforcing of contracts, and "the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." 109 S.Ct. at 2373.
 
 
 30
 The Court specifically held that racial harassment that occurs after the formation of the employment contract is actionable under Title VII, but not under Sec. 1981. Patterson, 109 S.Ct. at 2374. King Tree asserts that Patterson stands for the proposition that Peterson's claim of discrimination due to her discharge is not actionable under Sec. 1981. King Tree reasons that discharge from employment is necessarily conduct occurring after the formation of the contract.
 
 
 31
 Because we hold today that the district court correctly granted King Tree's motion for summary judgment on the Sec. 1981 and Title VII claims, we decline to reach the issue raised by King Tree. We intimate no opinion as to whether Patterson compels the conclusion that claims for discharge fall outside Sec. 1981's protection.[6]
 
 
 32
 The judgment of the district court is affirmed.
 
 
 33
 GEORGE CLIFTON EDWARDS, Jr., concurring in part and dissenting in part.
 
 
 34
 This case was decided by summary judgment. I concur with the court as to the race discrimination case but I would hold that the retaliation discharge claim should be reversed and remanded for trial.
 
 
 
 [1]
 Peterson began her employment with King Tree earning $6.25 per hour. On November 28, 1983, her wages increased to $6.50 per hour. On September 3, 1984, her wages increased to $7.50 per hour and, on September 2, 1985, to $7.75 per hour
 
 
 [2]
 Ronkin assessed Peterson as doing an "excellent job" and stated that he was "really impressed" with her. Whereas Hilkert rated Peterson a "fair team worker," Ronkin gave her a top rating as an "excellent team worker."
 
 
 [3]
 In support of her allegation, Peterson argues only that the white nursing director was responsible or jointly responsible for many of the duties that King Tree claims to have been only Peterson's. The record contains no evidence to support the contention that King Tree assigned Peterson new duties that she had no capability to perform
 
 
 [4]
 Not until her April 1988 affidavit did Peterson even refer to any general complaints about a lack of cooperation
 
 
 [5]
 Although these discharges occurred in 1985, nearly a year before Peterson lodged her allegation of disparate treatment, the discharges serve to refute the suggestion that King Tree was predisposed to discriminate against its Black employees. They also show a willingness to terminate administrators, of whatever color, for deficient performance
 
 
 [6]
 King Tree also alleges that Peterson cited to us and designated certain documents to be included in the record on appeal that were not presented to the district court. In affirming the judgment for King Tree, we have not needed to rely on those particular evidentiary materials. We therefore disregard both parties' arguments on this issue