Dorothy K. MEEHAN, Plaintiff,

v.

NEW ENGLAND SCHOOL OF LAW, Defendant.

Civ. A. No. 78–1257–N.

United States District Court, D. Massachusetts.

Sept. 11, 1981.

---

James F. Meehan, Parker, Coulter, Daley & White, Boston, Mass., for plaintiff.

James R. DeGiacomo, Roche, Carens & DeGiacomo, Boston, Mass., for defendant.

## FINDINGS OF FACT AND RULINGS OF LAW

NELSON, District Judge.

The plaintiff in this action is Attorney Dorothy K. Meehan. From August 1971 to July 1975, Meehan was a faculty member at New England School of Law (NESL), the principal defendant in this action. She alleges that she was wrongfully discharged from her teaching position and seeks damages and other relief from NESL, its board of trustees, individual members of the board, and two former deans of the school.[1]

Two of the original three counts of Meehan's complaint remain for decision.[2] First, Meehan alleges that the defendants discriminated against her on account of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Second, Meehan invokes the pendant jurisdiction of this court, and claims that the same defendants breached her employment contract.

These claims were tried before me on several days during the months of September and October of 1980. Final arguments and submissions were presented in June of 1981. Based on all the evidence and assisted by the voluminous briefs, arguments and requests for findings of fact and rulings of law, I now make the following Findings and Rulings.

NESL was founded in 1908 as an all-women's law school, then called Portia Law School. The school took its current name in 1969, and, in the same year, was provisionally accredited by the Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association (the "ABA Council").[3] The ABA Council awarded NESL full accreditation in 1973.

As a condition of accreditation, NESL, like other law schools, was required to promulgate faculty tenure rules and did so in March of 1973. For reasons that are apparent in this opinion, these rules play an important part in this case, and, therefore, clarity will be gained by discussing them in some detail prior to outlining the history of Meehan's employment at NESL.

The rules relevant to this case are those specifically governing the process by which faculty members become eligible for tenure. These rules are codified in Part II(A) of NESL's Faculty Handbook and are an implicit part of every faculty member's contract with the school.

Eligibility for tenure is principally governed by Tenure Rule I(A).[4] That rule

---

1. The list of defendants includes James R. Lawton, the Chairman of NESL's board of trustees; Colin Gillis and Cornelius Daly, former deans of NESL; and George M. Asack, Jacob M. Atwood, Joseph S. Ayoub, Anna Chaffee, Jerome E. Falbo, Bradbury Gilbert, Charles Hamilton, Anna E. Hirsch, John R. Jennings, Joseph J. Lorusso, Edward J. McCormack, Jr., A. Levitt Taylor, J. Owen Todd, Harold Udell and Abraham Yarchin, all of whom were members of NESL's board of trustees at the times relevant to this action.

2. The third count, based on Massachusetts' anti-discrimination statute, G.L. c. 151B, was dismissed by me on December 1, 1980, with the consent of the parties.

3. The parties stipulated that the ABA Council has been designated by the U. S. Commission of Education as the official accrediting agency of American law schools for the purpose of determining eligibility for federal funds. See Office of Education, Release No. 4110–02–M, 44 Fed.Reg. 4017 (1979). See also 45 C.F.R. §§ 149.1 and 149.3 (1980).

4. Tenure Rule I(A) provides:

   An individual shall be eligible for tenure at New England School of Law after not less than five years of law school teaching or

provides that a faculty member becomes eligible to be considered for tenure upon completion of certain minimum practice and teaching requirements. More specifically, a faculty member must have practiced or taught law for a total of at least five years prior to becoming eligible for review for tenure. Moreover, at least three of these years must have been spent teaching law, including at least one of those teaching at NESL. However, a faculty member does not become eligible for tenure if, prior to the completion of these minimum requirements, he or she is notified that his or her contract is not to be renewed. Since the board of trustees is responsible for hiring and firing faculty members, it is the board (or the dean acting at the behest of the board) that customarily notifies a faculty member whether his or her contract is to be renewed. *See* Part I(B) of the Faculty Handbook.[5]

Upon becoming eligible for tenure, a faculty member is reviewed for an award of tenure by the faculty tenure committee. Tenure Rule IV.[6] This committee is composed of the dean of the school and all tenured members of the faculty. Tenure Rule II.[7] The faculty tenure committee must meet at least once a year to consider for tenure those faculty members who are either eligible for tenure or who will become eligible for tenure within six months. Tenure Rule IV.[8] The factors to be considered by the committee in these deliberations are listed in Tenure Rule III(B).[9] The

practice of law. Of those five years, not less than three years shall be spent teaching law and not less than one such year shall be spent teaching law at the New England School of Law, provided that an individual will not be eligible for tenure if prior to his completion of the minimum requirements of eligibility, he has received notice that his contract will not be renewed.

5. Part I(B) of the Faculty Handbook provides:
   The school is governed by a Corporation and a Board of Trustees. Among other duties, the Board of Trustees is responsible for the hiring and promotion of members of the faculty, and it also hears appeals in cases involving the withdrawal of tenure. Matters of educational administration are delegated by the Board of Trustees to the Dean, the faculty and its committees.

6. Tenure Rule IV provides:
   The Tenure Committee shall meet annually, at which meeting all individuals eligible for tenure (or who within six months will become eligible for tenure) shall be considered. The annual meeting shall be held in sufficient time to allow the Chairman of said Committee to present the results of such meeting to the Board of Trustees prior to their meeting to consider the issuance of teaching contracts for the coming year.

7. Tenure Rule II provides:
   The Tenure Committee shall consist of all tenured members of the faculty and in addition shall include the Dean of the New England School of Law, whether or not said Dean himself has tenure.

8. Tenure Rule IV is reprinted in n. 6, *supra*.

9. Tenure Rule III(B) provides:

In order to properly evaluate an individual seeking tenure, the following sources of information shall be utilized by the Tenure Committee:

*Letter of Evaluation*—Not less than three months prior to the time when an individual shall become eligible for tenure, the Dean shall notify all members of the full and part-time faculty of that individual's coming eligibility. Any faculty member having a bona fide objection to the granting of tenure to the individual in question shall submit such objection in signed writing not less than one month prior to the time when that individual shall become eligible. The content of all adverse letters, including the identity of the author, shall be revealed to the candidate for tenure not less than three weeks prior to his eligibility for tenure.

*Student Opinion*—Not less than three months prior to the time when an individual becomes eligible for tenure, the Dean shall contact the Student Bar Association, inform said association of this fact, and instruct said association to furnish in writing any student evaluation of said individual not less than one month prior to eligibility. Such evaluation may be in the form of a signed individual student evaluation, or collective evaluation obtained by the Student Bar Association. Such evaluation shall be made available to the individual faculty member whom it concerns.

*Inspection*—At least two hours of class inspection of an individual seeking tenure shall be made by members of the Tenure Committee, provided that the first such inspection shall come not less than six months nor more than one year from the time said individual shall become eligible for tenure. Subsequent inspections may be held at any time. Said

rule directs the committee to consider written objections submitted by members of the faculty, student opinion, observations of the candidate's classes by members of the faculty tenure committee, personal appearances before the committee by the candidate or others, and other relevant information. Tenure is awarded if a majority of the committee votes in favor of the award. Tenure Rule III(A).[10]

If the faculty tenure committee fails to award tenure to a faculty member eligible for tenure, then the candidate becomes subject to Tenure Rule I(C).[11] That rule provides that the faculty tenure committee must again consider the candidate for tenure one year from the date of first eligibility. If the candidate is not awarded tenure on this second occasion, then his or her contract with the school is terminated on July 31 of the year following notice of this second failure by the committee to award tenure. The rule does not, however, expressly require that the candidate be offered a teaching contract for the academic years following either the first or second occasions on which tenure is not awarded by the faculty tenure committee. I find, however, that this requirement is implicit in the rule.[12] Thus, a faculty member who is not awarded tenure is entitled to be offered teaching contracts for up to two additional academic years.

NESL's tenure rules provide the backdrop against which Meehan's employment at NESL must be examined. Meehan graduated from Boston College School of Law in 1953, and after practicing law for a number of years in both New York and Massachusetts, received an LL.M. in Taxation from Columbia University School of Law in 1972. After deciding that she would like to teach law, Meehan spoke with Edward McCormack, an acquaintance and a member of NESL's board of trustees. McCormack recommended Meehan to NESL, and Meehan was hired in 1972.[13]

Her initial appointment was for the 1971–1972 academic year and was at a salary of $13,000. During this academic year,

individual shall be appraised [sic] of the results of his inspection within a reasonable time after each such inspection.
*Other Information*—The Tenure Committee may give appropriate consideration to any other relevant information regarding an individual eligible for tenure; provided that such information comes to the attention of the Committee not less than one month prior to the time when that individual shall become eligible. The nature, content, and source of all such information shall be revealed to the candidate for tenure not less than three weeks prior to his eligibility for tenure.
*Personal Appearance*—The Tenure Committee shall have the right to summon any individual eligible for tenure (or who will within six months become eligible for tenure) to appear personally before it; provided that any such individual shall have the right to appear personally before such Tenure Committee at his request.

10. Tenure Rule III(A) provides:
Tenure shall be granted upon majority vote of the Tenure Committee to an individual eligible for tenure.

11. Tenure Rule I(C) provides:
When an individual becomes eligible for tenure at New England School of Law and fails to receive said tenure, said individual shall again be considered for tenure one year from the date of first eligibility. If he is again denied tenure, notice to said individual of such second denial shall be accompanied by a notice that his contract will be terminated on July 31 of the year following the date of said notice.

12. This interpretation is not seriously disputed by the defendants. The rule is designed to provide a faculty member who has been passed over for tenure with a fourth year of teaching in which to improve. Moreover, the rule affords to the faculty tenure committee an opportunity to gather additional information to assist it in its mandatory reevaluation one year after its first refusal to award tenure. If the candidate did not teach during this interim year, these purposes would obviously be frustrated. The second contract has the salutary benefit of affording to the candidate time in which to seek new employment. From the school's point of view, a faculty member who has been permitted to remain at NESL for three years without receiving notice that his or her contract will not be renewed is unlikely to be a teacher of such limited quality as to severely impair the school's teaching functions if allowed to remain on the faculty for one or two additional years.

13. It is clear, however, that NESL hired Meehan solely because of her strong academic and professional qualifications.

both Dean O'Toole and Assistant Dean Daly received numerous student complaints about Meehan's teaching. Students complained that Meehan was condescending, incoherent, unresponsive to questions, and that she dealt with the material only superficially. Dean O'Toole discussed these criticisms with Meehan in a general way on a number of occasions.

Meehan was rehired by NESL for the 1972–1973 academic year at a salary of $15,000. Student complaints similar to those voiced in the preceding academic year persisted. In addition, other complaints surfaced; students complained that Meehan had cancelled classes, rescheduled them at inconvenient times, posted grades on her office door, and failed to review final examinations with students. James Lawton, the chairman of the board of trustees, and Charles Hamilton, a member of the board, received complaints about some of these matters and reported the complaints to O'Toole. As an example, in April of 1973, Lawton wrote to O'Toole to express his concern about student discontent with the faculty, especially with Meehan.[14] As he had done during the previous year, O'Toole discussed these complaints with Meehan in a general way.

During the 1972–1973 academic year, and the Summer of 1973, Meehan demonstrated on several occasions her commitment both to NESL and to improving her teaching skills. For example, Meehan organized a successful open house for women interested in law as a career in an effort to attract qualified women to NESL. Moreover, she helped a third-year day student gain admission to Boston University's Graduate Tax Program.[15] In addition, during the Summer of 1973, Meehan attended, at NESL's expense, a seminar on law school teaching at the University of Colorado, in an effort to improve her teaching skills.

Though Meehan was rehired by NESL for the 1973–1974 academic year (this time at a salary of $19,000), her teaching apparently did not improve. In fact, student complaints about her teaching were as frequent as they had been in the preceding two academic years. As before, Dean O'Toole discussed the problem with Meehan on several occasions. After O'Toole was replaced as dean by Colin Gillis in June of 1974, Gillis told Meehan several times beginning in late June that he was not at all sure that her contract would be renewed for the 1974–1975 academic year.

However, at least until Gillis raised this possibility with Meehan, the administration, faculty and student bar association proceeded on the assumption that Meehan would remain on the faculty and that she would be reviewed for tenure in the near future. Thus, as was his custom, O'Toole had standard form contracts prepared in May of 1974 for Meehan and NESL's other faculty members for the 1974–1975 academic year. On June 24, 1974, the board of trustees voted to renew all existing teaching contracts for the next academic year.[16] Further, during the Spring of 1974, O'Toole and Meehan exchanged memoranda about the courses that Meehan would teach during the 1974–1975 academic year.

Moreover, during the 1973–1974 academic year, the faculty tenure committee began to assemble the information it needed to review Meehan for tenure. After Meehan reminded him that she would soon be eligible for review for tenure, Dean O'Toole

14. Lawton wrote, in part:
    I feel it is imperative that you review the entire faculty situation and, in particular, the position of Assistant Professor Meehan. The student discontent regarding this situation is, in my opinion, as serious as it had been last year.

15. Meehan had a similar success with the administration of New York University's graduate School of Law in May of 1974. At that time, she was able to persuade NYU to give more careful consideration to NESL graduates applying to its programs.

16. However, there is no suggestion that the parties became contractually bound for the 1974–1975 academic year by virtue of this vote. No contract was signed by the board or even delivered to Meehan. In fact, Meehan concedes that she did not even learn of the vote until several years later, during pretrial discovery.

arranged for members of the faculty tenure committee to inspect Meehan's classes.[17] Assistant Dean Daly, a tenured faculty member, observed one session of Meehan's tax class in December of 1973. After the class, he told Meehan that he didn't know "what the hell she was talking about". Dean O'Toole, also a tenured faculty member, observed one session of Meehan's Civil Procedure class in the late Spring of 1974. His opinion, though not expressed to Meehan at the time, was that the class was difficult to follow. On March 25, 1974, Dean O'Toole sent a memorandum to the faculty reporting that six faculty members were eligible for tenure during the current academic year, and requested their comments about the scholarship and teaching abilities of the candidates.[18] Meehan was the only woman on the list. On April 30, 1974, the student bar association began its evaluation of the six candidates by distributing evaluation forms to students. By letter dated June 5, 1974, Anthony Traini, an SBA representative informed Dean O'Toole of the results of the survey. Meehan received the worst evaluation of the six candidates. The only other candidate who received a negative evaluation in the survey was Stanley B. Rosenfield.

Finally, on June 14, 1974, the faculty tenure committee met and discussed the six candidates listed in Dean O'Toole's memorandum of March 25. In addition to Dean O'Toole and Assistant Dean Daly, Professors Colin Gillis, Frank S. H. Bae, and Joseph J. Beard were present at the meeting. Discussion at the meeting focused both on the student survey and student opinion, and on the inspections of the candidates classes by members of the faculty tenure committee. Though no formal vote was taken at the meeting, the consensus was that, if such a vote were taken, it would be in the affirmative with respect to all the candidates except Meehan and Rosenfield. The committee was concerned about the negative student evaluations of Meehan and Rosenfield though its view was that the criticisms of Rosenfield were less serious than those of Meehan because they related primarily to the difficulty of his classes and not to his teaching abilities. In any event, the committee decided to give both Meehan and Rosenfield an opportunity to respond to the negative surveys and both did so. In addition, Meehan solicited comments from former students about her qualifications for an award of tenure; approximately 36 of Meehan's former students sent letters praising Meehan and recommending her for tenure.

But the faculty tenure committee never completed its review of Meehan for tenure. Instead, Lawton learned that Meehan had received an extremely negative student evaluation. He personally reviewed the individual student evaluations in early July of 1974 and based upon this review, Lawton concluded that the board of trustees should hold a meeting to discuss whether Meehan should be retained by NESL for the 1974–1975 academic year. This special meeting was held on July 29, 1974.[19] At the meeting, the trustees heard reports about the SBA survey, and had available to them Meehan's rebuttal of the survey,[20] and the letters that had been submitted by some of

17. See Tenure Rule III(B), ¶ 3. The entire rule is quoted in n.9, *supra*.

18. See Tenure Rule III(B), ¶ 1. The entire rule is quoted in n.9, *supra*.

19. The special meeting was called to discuss not only Meehan's status at NESL for the 1974–1975 academic year, but also to discuss the return to the faculty of another professor who had been on a leave of absence.

20. Meehan argued that the survey's results were meaningless because the survey had been conducted so poorly. I agree that the survey left much to be desired. For example, questionaires were distributed throughout the school without safeguards to insure that each student would fill out only one questionaire per course or that only students who had taken a course evaluated it. But the fact remains that many students evaluated Meehan's courses and took the time to make personal observations. And these observations were overwhelmingly negative about her teaching effectiveness. Thus, I think that the board of trustees was justified in considering the survey as some evidence that Meehan was an ineffective teacher, particularly because its results were consistent with the other indications that the board had that this was the case.

her former students.[21] The board discussed these materials and listened to comments by Hamilton and others about the complaints that they had received from students about Meehan's effectiveness as a teacher. Based on this discussion, the board concluded that Meehan should be terminated from the faculty. The board's understanding was that Meehan was not yet eligible for tenure, and that it was therefore free to terminate Meehan from the faculty effective July 31, 1974, the last day of her contract for the 1973–1974 academic year. However, to be fair to Meehan and to give her adequate time to seek a new position, the board authorized McCormack and Gillis to negotiate a contract with Meehan for the 1974–1975 academic year. In so doing, however, the board was concerned that Meehan's relationship with NESL be finally terminated at the end of that academic year. Thus, the board instructed McCormack and Gillis to condition any contract for Meehan for the 1974–1975 academic year on her agreement to forego any rights to be treated as a faculty member eligible for tenure.

Immediately after the board meeting, Gillis telephoned Meehan and informed her of its decision. In addition, he sent her a letter dated August 1, 1974, restating these results. Gillis and McCormack then began the process of negotiating a contract with Meehan for the 1974–1975 academic year. At Gillis' request, Meehan met with McCormack and him on several occasions in the first few days of August to discuss a contract for Meehan for the 1974–1975 academic year. Accordingly, a contract was negotiated and signed by the parties on September 5, 1975.[22] The contract provided that Meehan would teach elective courses during the 1974–1975 academic year and serve as an assistant to Daly at a salary of $20,240. In addition, at Meehan's request, her title was changed from assistant professor to associate professor. Finally, the contract

contained the following two sentences relating to Meehan's rights to be reviewed for tenure:

The appointee is hereby put on notice that her contract will not be renewed after July 31, 1975. In view of the fact that her contract is not to be renewed after July 31, 1975 the appointee waives any right to review for tenure.

Prior to signing the contract, Meehan consulted with both her husband, a prominent Boston attorney and lead counsel in this case, and James White, the consultant to the ABA Council. White informed Meehan that it was doubtful that the ABA Council would honor the tenure clause.

Meehan taught during the 1974–1975 academic year and was fully paid by NESL for her efforts. The student evaluations conducted during this academic year reflected a marked improvement in Meehan's teaching skills. In the Spring of 1975, Meehan met with O'Toole and Beard in their capacity as members of the faculty tenure committee and asked whether she would be reviewed for tenure. They told her that their opinion was that the faculty tenure committee had no authority to do so in light of the tenure rights clause contained in the contract signed by NESL and Meehan on September 5, 1975.

Not satisfied with this state of affairs, Meehan appealed to the full faculty. On June 18, 1975, at Meehan's request, the faculty approved a resolution recommending that Meehan file a complaint with the ABA Council. Meehan did so, and after she appeared before the ABA Council at a meeting of the ABA in Montreal in the Summer of 1975, Edward S. Godfrey, then dean of the University of Maine Law School and now a member of the Supreme Court of Maine, was appointed to investigate her complaint. Godfrey held a hearing in Boston on November 12, 1975, at which all parties were afforded an opportunity to

---

21. Meehan had sent her rebuttal of the SBA survey and copies of the letters to each member of the board of trustees a couple of weeks earlier. In addition, at the meeting, the board took a 10–15 minute break to enable board members to review these materials.

22. The board of trustees ratified the contract at its meeting on September 16, 1974.

present evidence relating to Meehan's complaint. He issued his report in December of 1975, concluding that Meehan became eligible for tenure prior to receiving notice that her contract would not be renewed for the 1974–1975 academic year. But Godfrey did not consider the effect of the September 5 contract. Moreover, he did not, and the parties agree that he could not, direct NESL to reinstate Meehan or to make any payment to her. Instead, he suggested only that NESL amend its tenure rules to avoid similar confusion in the future and he recommended to the ABA Council that it conduct a reinspection of NESL in the Spring of 1976.

The board of trustees was notified of Godfrey's conclusions sometime in December or early in January. The next meeting of the board was held on January 20, 1976, and at that meeting, one of the topics of discussion was what, if anything, the board should do in response to Godfrey's report. The board concluded that it need not do anything immediately and that it would await the reinspection. In fact, most of the discussion of Godfrey's report focused not on Meehan, but on the logistics of the reinspection.

Having failed to gain reinstatement, Meehan filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) and a charge with the Equal Employment Opportunity Commission (EEOC) on March 26, 1976. Here for the first time, Meehan alleged that she had been the victim of sex discrimination. At Meehan's request, the MCAD waived jurisdiction to the EEOC and, on May 23, 1978, the EEOC concluded that reasonable cause existed to believe that NESL had discriminated against Meehan on account of her

sex. Thereupon, the EEOC attempted to conciliate the dispute but, failing in these efforts, it notified Meehan on June 6, 1978 of her right to sue the respondents named in her charge. This suit followed the very next day.[23]

Of the two claims that remain for decision,[24] I shall treat the contract claim first. The substance of this claim is that Meehan became eligible for tenure in May of 1974 when classes ended, and that NESL breached its contract with her when it refused to accord her the rights due her as a faculty member eligible for tenure.[25]

The defendants deny that they breached the contract, and argue that Meehan was notified that her contract with NESL would not be renewed before she became eligible for tenure. Alternatively, the defendants contend that, even if Meehan had become eligible for tenure, the September 1974 contract effectively extinguished any rights to which Meehan otherwise may have been entitled.

The initial question that I must resolve is whether Meehan became eligible for tenure prior to receiving notice that her contract with NESL would not be renewed for the 1974–1975 academic year. The parties agree that immediately following the meeting of the board of trustees on July 29, 1974, Meehan was notified that her contract would not be renewed. However, the parties differ on whether this notice came before or after Meehan became or would have become eligible for tenure. Resolution of this question turns on the meaning of the requirement in Tenure Rule I(A) that "no less than three years shall be spent teaching law."[26] The 1973–1974 academic year was Meehan's third year of teaching law. The

**23.** This was actually the second suit filed by Meehan against NESL and its board of trustees. In July of 1977 Meehan sued these defendants alleging that they had conspired together to deny her the opportunity to be reviewed for tenure by the faculty tenure committee. Meehan v. NESL, C.A. 77–1982–N. That action was dismissed by agreement of the parties.

**24.** See n.2, *supra.*

**25.** Obviously the contract claim is governed by the law of Massachusetts. All the parties reside in Massachusetts, and Meehan's contracts with NESL were negotiated, signed and fully performed here. *See, Choate Hall & Stewart v. SCA Services,* Mass.Adv.Sh. (1979) 1877, 1884, 392 N.E.2d 1045.

**26.** See Tenure Rule I(A), quoted in full in n.4, *supra.*

parties agree that that contract year ended on July 31, 1974, that Meehan turned in her grades in late June of 1974, and that classes ended on May 2, 1974. Therefore, NESL's notice to her that her contract would not be renewed came prior to Meehan's completion of her third year of teaching only if the quoted phrase in Tenure Rule I(A) refers to three contract years.

Though I think the question is a close one, I am persuaded that Meehan satisfied the three-year teaching requirement at the latest when she submitted her grades prior to receiving notice that her contract would not be renewed. Tenure Rule I(A) refers to *teaching* law, and once Meehan submitted her grades for the second semester of the 1973–1974 academic year, she had satisfied her teaching obligations for that academic year. The defendants introduced no evidence that Meehan, or any other faculty member, has any teaching or other obligations to the school once the grading is completed.

Having determined that Meehan became eligible for tenure prior to receiving notice that her contract would not be renewed, I now must consider the effect of the contract signed by Meehan and NESL on September 5, 1974. On its face the contract appears to extinguish any rights to review for tenure that Meehan may have had. However, Meehan contends that I should not give the contract that effect for four separate reasons.

First, Meehan argues that the contract was invalid because it was not supported by adequate consideration. Specifically, Meehan's contention is that, because she was a faculty member eligible for tenure, NESL was under an obligation to offer her a contract for the 1974–1975 academic year;[27] therefore, its agreement to do so could not support her agreement in the contract to forego any rights to be considered for tenure.

I agree with Meehan that, to be valid, the September contract had to be supported by valid consideration. *See, e. g., Restatement of Contracts*, § 408, comment (a), and § 19 (1932). However, I find that there was consideration to support the contract. The general rule regarding pre-existing duties as consideration is that one who is contractually bound to another to perform an act may not exact a new promise from the promisee by agreeing to perform the act. *In re Lloyd Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980). However, there is a well-recognized, important exception to this general rule. In situations in which the duty is doubtful or is the subject of an honest and reasonable dispute between the parties, the promisor's agreement to do more than he or she honestly and reasonably believes he or she is required to do may be sufficient consideration to support a new promise by the promisee. *Sherman v. Sidman*, 300 Mass. 102, 105, 14 N.E.2d 145 (1938), *Restatement of Contracts*, § 76(a) and Illustration 4; and § 78, especially comment b (1932). *See also, Lisbon Spinning Company v. Worcester Tire Fabric Company*, 301 Mass. 437, 17 N.E.2d 313 (1938).

This case is governed by the exception to the general rule. As of September 5, 1974, the date on which Meehan and NESL signed the contract for the 1974–1975 academic year, the parties honestly and reasonably disagreed about whether Meehan was entitled to a contract for that academic year. Therefore, I conclude that NESL's agreement to offer Meehan a teaching contract for 1974–1975 was sufficient consideration to support both Meehan's agreement to teach during that year and her further agreement to forego any rights that she might have as a faculty member eligible for tenure. There is no doubt that NESL fully performed its obligations under the September 5 contract.

Meehan's second argument is that the September 5 contract is invalid because

27. See Tenure Rule I(C), quoted in full in n.11, *supra*, and my analysis of the rule at p. 488, *supra*.

she signed it under duress. To prevail on this theory, Meehan must show that NESL knew or believed that its actions in negotiating and obtaining the contract could not be substantiated and that but for its conduct, Meehan would not have signed the contract. *International Underwaters Contractors, Inc. v. New England Telephone & Telegraph Co.*, Mass.App.Ct.Adv.Sh. (1979) 1816, 393 N.E.2d 968. Meehan's duress argument fails because of the first part of this test. NESL and the other defendants reasonably believed that Meehan was not eligible for tenure on September 5, 1974. Therefore, the defendants did not negotiate and sign the September 5 contract knowing or having reason to know that their position that Meehan was not eligible for tenure consideration could not be substantiated.

I have no doubt that Meehan was faced with a difficult choice when confronted with the defendants' insistence that any contract for the 1974–1975 academic year include an agreement by Meehan to waive any rights to be considered for tenure since, as a practical matter, it might well have been impossible for her to find another teaching position for the 1974–1975 academic year. However, that fact does not establish that the contract is invalid on a theory of duress. The defendants acted under the reasonable and good faith belief that they had no obligation to offer Meehan any contract for the 1974–1975 academic year. In accepting the contract for that academic year, Meehan received a valuable benefit: a teaching contract for the 1974–1975 academic year, which included the opportunity to seek another appointment elsewhere while still retaining her working status.

Meehan's third argument about the September contract is that the tenure rights clause is invalid because it is unconscionable. This argument is without merit. The concept of unconscionability is codified in the Uniform Commercial Code, M.G.L. c. 106, § 2–302, but, by analogy, it has been applied in Massachusetts to contracts outside the ambit of the U.C.C. *See, e. g., Zapatha v. Dairy Mart, Inc.*, Mass.Adv.Sh.

(1980) 1837, 1843, 408 N.E.2d 1370; *Commonwealth v. DeCotis*, 366 Mass. 234, 242, 316 N.E.2d 748 (1974). In *Zapatha*, the Supreme Judicial Court explained that unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged term could result in unfair surprise and to whether that term was oppressive to the disadvantaged party. *Zapatha* at 1845, 408 N.E.2d 1370.

■ Neither element was present here. Certainly Meehan cannot seriously contend that the possibility of surprise, unfair or otherwise, existed. She, herself, as an experienced attorney, carefully negotiated the language of the clause. *See, Zapatha* at 1840, 1846–7, 408 N.E.2d 1370. She had ample opportunity to discuss the clause with another attorney. *See Id.* In addition, the clause was obviously prominent in the contract and was "neither obscurely worded nor buried in fine print in the contract." *Id.* at 1846, 408 N.E.2d 1370. Moreover, the tenure rights clause was not oppressive to Meehan. Oppressiveness in this context is directed to the substantive fairness of the inclusion of the challenged term in the contract. *Id.* at 1847, 408 N.E.2d 1370. The relevant reference point in time is when the contract was formed. In September of 1974, Meehan and the defendants had a good faith dispute about Meehan's status at NESL. The contract that they signed, including its tenure rights clause, was a reasonable and civilized way to resolve this dispute. Therefore, the tenure rights clause is not invalid because of unconscionability.

■ Meehan's final argument about the September contract is that its tenure provision was intended to apply only to rights to be considered for tenure that Meehan might otherwise have acquired during the 1974–1975 academic year and to have no effect on any such rights that she had acquired prior to September 5, 1974. I reject this proposed interpretation for two reasons. First, it is inconsistent with the language of the provision.[28] The provision

28. The text of the clause is reprinted in full on page 491 of this opinion.

clearly states that Meehan waived *any* rights to be considered for tenure, and is not limited to just future rights. Second, Meehan's interpretation is inconsistent with the parties' agreement that her contract would not be renewed after the 1974–1975 academic year. This critical agreement is stated in the tenure provision both in the sentence preceding and in the sentence containing Meehan's waiver of any rights to tenure consideration. But if Meehan's interpretation of the provision is correct, then she would have been entitled to be reviewed for tenure sometime in the late Spring of 1975. And whether tenure was awarded to her by the faculty tenure committee at that point or not, she would have been entitled to a contract for the 1975–1976 academic year.[29] Thus, Meehan's rights as a faculty member eligible for tenure would necessarily clash with the parties' agreement that her contract with NESL would not be renewed after the 1974–1975 academic year, and there is nothing in the September 1974 contract that would suggest that this agreement was conditional in this or in any other way. Under these circumstances, I find that the only reading of the September 1974 contract that is supported by the evidence is that Meehan agreed to forego any and all rights to be considered for tenure. The contract signed by the parties on September 5, 1974 was valid, and it operated to extinguish Meehan's right to be reviewed for tenure.[30]

The question that now remains is whether the defendants discriminated against Meehan on account of her sex in their dealings with her. Meehan's claim of discrimination is that beginning in the Summer of 1974 and continuing at least through January of 1976 when the board of trustees met and declined to reinstate her in light of Godfrey's conclusions, the defendants refused to permit her to be reviewed for tenure by the faculty tenure committee because of

her sex. This conduct, if proved, would constitute a violation of Title VII. However, I find that Meehan has failed to demonstrate that her sex influenced the defendants and was in any respect a basis for their actions. Therefore, Meehan has not proved that the defendants violated Title VII.

Evaluation of a Title VII case is a three-part process. First, the plaintiff must make out a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant articulates such a reason, the plaintiff must show that the proffered rationale was not the defendant's true reason, but instead was a pretext for illegal discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *Banerjee v. Board of Trustees of Smith College,* 648 F.2d 61, 63 (1st Cir. 1981). However, notwithstanding these intermediate evidentiary burdens, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff." *Texas Department of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1093, citing *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25 n.2, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1979) and *id.* at 29, 99 S.Ct. at 297 (Stevens, J., dissenting).

The burden of establishing a prima facie case is not intended to be an onerous one; instead, the plaintiff must show only that he or she applied for a job (or was fired or demoted from one) under circumstances which suggest the possibility that unlawful discrimination was a motivating

**29.** See Tenure Rule I(C) which is reprinted in full in n.11, *supra.*

**30.** For reasons similar to those already stated, I also reject Meehan's argument that the defendants, in their dealings with her, somehow breached their duty of fair dealing and good

faith. *See, Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977); *Richey v. American Automobile Association, Inc.,* Mass.App.Ct.Adv.Sh. (1980) 1425, 406 N.E.2d 675. The defendants dealt with Meehan fairly and in good faith.

factor in the employer's decision. *Texas Department of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1094. What a plaintiff must prove to make this showing necessarily varies based on the facts of a particular case. *Texas Department of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1094 n.6; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575–6, 98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 and n.44, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 279 n.6, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976); *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802 and n.13, 93 S.Ct. at 1824. *See also, Banerjee v. Board of Trustees of Smith College, supra,* 648 F.2d at 62–63; *Carton v. Trustees of Tufts College,* 25 E.P.D. ¶ 31,-630 at 19,650 (D.Mass.1981); *Huang v. College of the Holy Cross,* 436 F.Supp. 639, 653 (D.Mass.1977).

■ Meehan has made out a prima facie case of employment discrimination. Her claim is that the defendants refused to permit her to be reviewed for tenure by the faculty tenure committee because she is a woman. To make out a prima facie case of discrimination based on this claim, Meehan must show: (i) that she is a member of a group entitled to the protections of Title VII; (ii) that she was eligible to be reviewed for tenure; and (iii) that the defendants denied her the opportunity to be reviewed for tenure. Meehan has made each of these showings. She is a woman, and discrimination on the basis of sex is prohibited by Title VII. 42 U.S.C. § 2000e–2(a)(1). Moreover, I have already concluded that Meehan became eligible for consideration for tenure prior to being notified by the defendants that her contract would not be renewed for the 1974–1975 academic year. Finally, the faculty tenure committee quite reasonably and predictably declined to consider Meehan for tenure during the 1974–1975 academic year because of the tenure rights provision contained in the September 5, 1974 contract. Since this provision was inserted at the insistence of the

defendants, I find that they effectively denied Meehan the opportunity to be reviewed for tenure. Moreover, even after Godfrey concluded that the defendants had violated NESL's tenure rules by failing to treat Meehan as a faculty member eligible for tenure, they declined to reinstate her or to take any other measures which would have made it feasible for the faculty tenure committee to review her for tenure.

The effect of my conclusion that Meehan has made out a prima facie case of discrimination is to create a rebuttable presumption that the defendants discriminated against her. *See Texas Department of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1094 n.7 and 8, and accompanying text; *Riley v. University of Lowell,* 651 F.2d 822, 26 E.P.D. ¶ 31,905 at 21,036 (1st Cir. 1981). To rebut this presumption, the defendants must meet their evidentiary burden which is to produce evidence that they had legitimate, nondiscriminatory reasons for their decision to deny Meehan the opportunity to be reviewed for tenure. *See, Texas Department of Community Affairs v. Burdine, supra. See also, Board of Trustees of Keene State College v. Sweeney, supra,* 439 U.S. at 24–25, 99 S.Ct. at 295; *Furnco Construction Corp. v. Waters, supra,* 438 U.S. at 578, 98 S.Ct. at 2950.

■ The defendants have satisfied this burden of production. They introduced evidence at trial which would permit me to find that they believed, in good faith, that they were entitled to terminate Meehan from the faculty, and that this step was necessary because Meehan was not an effective law teacher. A review of this evidence follows.

Prior to the time that a faculty member becomes eligible for tenure, the board of trustees may notify the teacher that his or her contract will not be renewed for the next academic year, thereby preventing the teacher from becoming eligible for tenure. Until a faculty member becomes eligible for tenure, the faculty tenure committee may

not consider the candidate for tenure.[31] I have already found that, at all relevant times, the defendants honestly and reasonably believed that Meehan was not yet eligible for tenure and that the board of trustees was, therefore, free to decline to offer her a teaching contract for the 1974–1975 academic year.

Thus, when the board of trustees met on July 29, 1974, the issue of Meehan's contract for the 1974–1975 academic year was apparently an appropriate topic for the board's consideration. Meehan had received a very poor student evaluation and, after he had read the individual student comments, Chairman Lawton concluded that the full board should discuss the problem. At the meeting, the board was informed about the student evaluations. The board also heard from Dean Gillis and Assistant Dean Daly, both of whom were familiar with Meehan's teaching, and both of whom reported that her teaching was seriously deficient. Moreover, the board heard from trustee Charles Hamilton who reported that he, too, had received complaints from students about Meehan's teaching. Finally, the board was given an opportunity to review the letters that Meehan had solicited from former students and had delivered to the board. Based on this information, the board concluded that NESL's interests would best be served by terminating Meehan from the faculty.

However, rather than terminate Meehan immediately, which the board reasonably believed it was free to do, the board concluded that it would be fairer to offer Meehan a teaching contract for the 1974–1975 academic year. Such an accommodation, the board reasoned, would give Meehan adequate time to seek a new position. But, in so doing, the board sought to establish clearly that Meehan's relationship with NESL would terminate at the end of the 1974–1975 academic year; hence, McCormack and Gillis' insistence on the provision relating to Meehan's tenure rights. Moreover, in fairness to NESL's students, the board also concluded that Meehan should teach only elective courses, and, to complete her schedule, should assist Daly. Such a contract was negotiated by Meehan, McCormack and Gillis between July and September of 1974, and was signed by the parties on September 5, 1974.

That put an end to the issue, at least as far as the defendants were concerned. However, Meehan pursued her complaint through the ABA Council, and, in December of 1975, the ABA Council's hearing examiner, Edward Godfrey, concluded that NESL had erred in failing to treat Meehan as a faculty member eligible for tenure. Godfrey did not, however, consider the effect of the contract that the parties had signed on September 5, 1974. He did suggest that the ABA Council reinspect NESL and that NESL revise its tenure rules to resolve the rules' ambiguity, now made dramatically clear in this dispute. The defendants received Godfrey's report sometime in December of 1975 or January of 1976, and the board of trustees met on January 20, 1976. At this meeting, the board heard a report on the substance of Godfrey's report. However, it was clear to the board that nothing in Godfrey's report undercut its substantive decision that Meehan was an ineffective teacher who should not be a member of NESL's faculty. Moreover, the board concluded that it was under no obligation to reinstate Meehan or to permit her to be reviewed for tenure. Thus, the only specific measure that the board took was to discuss the logistics of the reinspection that Godfrey had recommended.[32]

---

**31.** The faculty tenure committee may also consider for tenure those faculty members who will become eligible for tenure within six months. See Tenure Rule IV, quoted in n.6, *supra*. However, this early consideration is a matter of convenience and does not affect the power of the board to prevent a faculty member from becoming eligible for tenure by notifying the faculty member prior to his or her completion of the minimum requirements that his or her contract will not be renewed.

**32.** Effective August 1, 1976, NESL revised its tenure rules to make clear that a faculty member becomes eligible for tenure "as of the last day of the contract year in which he or she completes the [minimum teaching and practice] requirements." However, it does not appear

Taken together, the defendants' evidence satisfies their burden of production and therefore rebuts the presumption of discrimination created by the plaintiff's prima facie case. There is evidence, which if taken as true would support the defendants' contention that they were motivated by their desire to terminate Meehan from the faculty because they had little professional confidence in her.

Faced with the defendants' rebuttal of her prima facie case, the burden of persuasion remained on Meehan to demonstrate that the defendants' proffered reasons for their actions were pretexts for unlawful sex discrimination. *See Texas Department of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1095; *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804, 93 S.Ct. at 1825. Proof of a claim of discrimination in violation of Title VII is no easy matter for a plaintiff. Rarely does an employer announce that its employment decision has been motivated by discriminatory animus. But the burden of proving that such discrimination has occurred is on the plaintiff, and Meehan has not met her burden in this case.

Much of Meehan's effort to satisfy her burden focuses on the circumstances surrounding the defendants' decision to terminate her from NESL's faculty. Meehan argues that these circumstances constitute persuasive evidence that the defendants discriminated against her. I am not persuaded. Thus, for example, Meehan points to the fact that no other faculty member had previously been required to sign a tenure rights clause similar to the one contained in the September 1974 contract.

Moreover, the evidence established that faculty members who had been terminated in the past received notice that their contract would not be renewed for the next academic year in December of the then current academic year.[33] Meehan, of course, was not notified until late July 1974, approximately six weeks before the start of the new academic year.[34] It is clear to me that the defendants did not handle the issue of Meehan's employment with the administrative skill that I would expect from a law school administration making important personnel decisions. But a lack of administrative skill is not unlawful discrimination. And the peculiarities in the defendants' handling of the Meehan case are no more probative of unlawful discrimination than they are of an administratively inept, eleventh hour, but legitimate, decision to terminate an ineffective teacher. Therefore, I attach little weight to this evidence. Moreover, there is paucity of other evidence to support Meehan's claim of discrimination. For example, Meehan offered no evidence that, during the period of time that she taught at NESL, she was the victim of discrimination in course assignment, compensation, or in any other manner. Some of the other evidence that Meehan did offer merits brief comment, however.

It is undisputed that NESL has never had a woman on its tenured faculty; indeed, at the time that Meehan was terminated from the faculty, NESL's six tenured faculty members were all white males. Meehan argues that this statistical information constitutes evidence that the defendants discriminated against her. However, given the

that this revision was discussed at the board's meeting on January 20, 1976.

**33.** For example, Terence J. Moore was notified by O'Toole in December of 1973 that his contract would not be renewed for the 1974–1975 academic year.

**34.** Obviously, the timing of the defendants' notice and their decision to offer Meehan a contract for the 1974–1975 academic year are connected. At its meeting on July 29, 1974, the board of trustees concluded that Meehan should be terminated. However, the board also recognized that this decision came rather late.

Therefore, to be fair to Meehan, the board agreed to offer her a contract for the 1974–1975 academic year. To be fair to the student body, the board determined that Meehan should teach only electives. And to resolve with certainty the issue of Meehan's employment, the board insisted that the contract contain a clause extinguishing Meehan's rights to be considered for tenure. This may not have been the easiest way to terminate Meehan from NESL's faculty (notice in December of 1973 would have been easier), but I am not persuaded that it was unlawful discrimination.

absence of more specific evidence of such discrimination, the statistical data is entitled to little weight in the present case, particularly in view of the small numbers involved. *See, Sweeney v. Board of Trustees of Keene State College, supra,* 604 F.2d at 113 n.11, and accompanying text; *id.* 569 F.2d 169, 178–9, *reversed on other grounds,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). *See also McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 805 n.19, 93 S.Ct. 1826; *Carton v. Trustees of Tufts College, supra,* at 19,652. Thus, although I have serious misgivings about NESL's failure to attract and to promote to tenure qualified women and minority faculty members, I do not find that its failure to do so materially furthers Meehan's discrimination claim.

Moreover, in fairness, I find that part of the confusion in this matter resulted from the efforts of O'Toole, Daly and others to retain Meehan. But when it became apparent to the defendants that Meehan's teaching had not improved during the Spring semester of the 1973–1974 academic year, as hoped, and that she would soon become eligible for tenure consideration (and teaching contracts for up to two additional academic years), the defendants necessarily acted at the last minute to prevent Meehan from becoming eligible for such consideration.

Meehan also complains that she had impressive credentials and that male faculty members no more qualified and some less qualified than she were awarded tenure. In particular, Meehan compares herself to Professor Stanley Rosenfield, the other faculty member who received a negative evaluation in the SBA survey in the Spring of 1974. Rosenfield was permitted to remain on the faculty, and he was awarded tenure in 1974. It is true that Meehan and Rosenfield were treated differently, but their situations were different. The criticisms of Rosenfield related principally to his demands on the students and did not call into question his effectiveness as a teacher. And there was no history of criticisms about Rosenfield's teaching effectiveness. Moreover, Rosenfield had the support of the tenured faculty, having been recommended for tenure by the faculty tenure committee in 1973. The evidence at trial revealed that Rosenfield was a prolific author and that Meehan was not. These differences persuade me that the situations of Rosenfield and Meehan were sufficiently different so that a comparison of the defendants' treatment of them would be unhelpful.

To prove that she was as qualified or better qualified than males at NESL who had received tenure, Meehan offered the testimony of Professor Oscar Chase of New York University School of Law. My problem with his testimony is that the determination made by the board of trustees was not that Meehan did not have adequate credentials, but rather that she was not an effective teacher. On this point, Chase's testimony is not germane.

■ Courts have been reluctant to intrude in the process of selection, retention and promotion of faculty members. *See, e. g., Sweeney v. Board of Trustees of Keene State College, supra,* 604 F.2d at 112; *Huang v. College of the Holy Cross, supra,* 436 F.Supp. at 653; *EEOC v. Tufts Institution of Learning,* 421 F.Supp. 152, 158 (D.Mass.1975); *See also, Lieberman v. Gant,* 630 F.2d 60, 67 n.12 and accompanying text (2d Cir. 1980); *Kunda v. Muhlenberg College,* 621 F.2d 532, 547–8 (3d Cir. 1980); *Faro v. New York University,* 502 F.2d 1229, 1232 (2d Cir. 1974); *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328, 1353–5 (W.D.Pa.1977); *Peters v. Middlebury College,* 409 F.Supp. 857, 868 (D.Vt. 1976). I share this reluctance. Absent impermissible discrimination, a university is free to select and retain those faculty members that it deems most suitable.

It was for the defendants to determine whether Meehan should be retained. They may have been correct or incorrect in their assessment of Meehan's effectiveness in the classroom. However, after a careful review of all the evidence, I am not convinced that their decision breached Meehan's contract with NESL or that it was based on unlawful discrimination; therefore, judgment must enter in favor of the defendants.