**Elfreida L. CAVALLARI, Plaintiff,**

v.

**John C. STETSON, Secretary of the Air Force, Defendant.**

**Civ. A. No. 78–1266–N.**

United States District Court,
D. Massachusetts.

Nov. 30, 1982.

Robert P. Sullivan, Lowell, Mass., for plaintiff.

Ralph Child, Asst. U.S. Atty., Boston, Mass., for defendant.

### FINDINGS OF FACT AND RULINGS OF LAW

NELSON, District Judge.

*Introduction*

This is an employment discrimination case, in which plaintiff Elfreida Cavallari alleges that the United States Air Force violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., by failing to promote her to the position of Chief Librarian of the Geophysics Laboratory Library at Hanscom Air Force Base in Bedford, Massachusetts. Mrs. Cavallari maintains that she was denied the promotion because she is a woman, despite the fact that she was the most qualified for the position.

This is a disparate treatment case under Title VII, and Mrs. Cavallari is the sole plaintiff. Thus, I am not asked to review the pattern, practice, or impact of any aspect of Air Force employment policies in general. Rather, the central question in this case is the intent of the selection official, James Murphy, at the time he made the subjective judgment to promote a male, Mr. Cunha, and not Mrs. Cavallari. Employment practices at the Base are relevant only as they bear upon Mr. Murphy's state of mind and provide any inference as to intent.

The structure for evaluating a Title VII disparate treatment claim is by now well established. First, the plaintiff must make out a *prima facie* case of discrimination. If she does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant articulates such a reason, the plaintiff must show that the proffered rationale was not the defendant's true reason, but instead was a pretext for illegal discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 1824, 1825, 36 L.Ed.2d 668 (1973); *Banerjee v. Board of Trustees of Smith College,* 648 F.2d 61, 63 (1st Cir.1981). It is important to note, however, that despite these intermediate evidentiary burdens, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine, supra* 450 U.S. at 253, 101 S.Ct. at 1093.

*Preliminary Findings of Fact*

In November of 1976, the incumbent Chief Librarian at the Geophysics Laboratory Library, a woman, gave notice of her resignation. Pursuant to an internal two-week posting of the position mandated by Civil Service regulations, three individuals employed at the library applied to be Chief Librarian. The Personnel Office at the Base processed these applications by matching applicants' credentials to the job description and qualifications sheet for the position. As a result of this matching process, all three of the library applicants re-

ceived a "promotion certificate." The effect of such certificate was to designate each of the three applicants "highly qualified" for the position, and to entitle each to a personal interview with the selecting official, in this case Mr. James Murphy, Chief of Operational Services Branch of the Cambridge Research Laboratories at Hanscom Air Force Base. I find that this personnel office procedure was quantitative and objective, in that each candidate was scored on the basis of training, education, years of experience and any performance awards received.[1]

The second stage in the process for the three certified candidates was a personal interview with selection official Murphy, who held overall administrative responsibility for the library. Mr. Murphy testified that he interviewed the three candidates to determine who would be the best qualified for the position. I find that Mr. Murphy spent approximately one-half hour with each candidate, asking each a series of prepared questions on library management, and gauging each applicant's responses. The interview questions focused on three areas: staff compatibility, management responsibility, and critical problems facing the library. As Mr. Bergman had very limited experience with the library, Mr. Murphy considered him to be the weakest candidate. In comparing Mr. Cunha and plaintiff Cavallari, Mr. Murphy made a series of observations.

First, Mr. Cunha had spent six more years at the Air Force library itself than had Mrs. Cavallari. Second, Mr. Cunha's position as Chief of Acquisitions had exposed him to a broader-based view of the library and its problems than had Mrs. Cavallari's position as Chief of Cataloguing. The third observation was based on Mr. Murphy's opportunity to evaluate the relative performances of the two candidates, as a result of his regular visits to the library and his review of the monthly reports submitted by each. He found Mr. Cunha's

performance to indicate a sensitivity to budget considerations and other managerial constraints facing the library. He testified that Mr. Cunha's reports proposed solutions to some of these constraints and focused on critical areas. Mrs. Cavallari's reports, in contrast, were weak, lacked detail, and reflected a rather single-minded view that her own operation, particularly the automation of cataloguing, was the most important task facing the library. Finally, Mr. Murphy made an assessment of the respective personalities of the two candidates. His judgment was that Mr. Cunha was a more outgoing person, and could get along with other library staff. Murphy offered the opinion that "management is a selling proposition." He felt that Mrs. Cavallari would be less able to perform this crucial component to the job. He therefore considered Mr. Cunha more qualified to be Chief Librarian.

*The Prima Facie Case*

█ The formula for establishing a *prima facie* case in Title VII actions is also well established, having been set out in the early case of *McDonnell Douglas, supra,* and modified to the facts of subsequent Title VII cases:

> 1) that plaintiff belongs to a class protected by the statute,
>
> 2) that she applied and was qualified for the position,
>
> 3) that despite her qualifications, she was rejected, and
>
> 4) that the position was filled with another.

411 U.S. 792, 802 and note 13, 93 S.Ct. 1817, 1824 and note 13, 36 L.Ed.2d 668 (1973).

Applying this formula, I rule that the plaintiff has made out a *prima facie* case of discrimination. She is a woman, and discrimination on the basis of sex is prohibited by Title VII, 42 U.S.C. § 2000e–2(a)(1). The parties agree that she qualified for the position, along with her two competitors, as

---

1. The only variable upon which selecting official Murphy may have had previous input was that of performance awards, in that the record shows his approval of two such awards to

applicant Cunha well before the incident in question. However, these awards accounted for only 3 of the 200-odd points available to the applicants on the promotion certificate score.

evidenced by the promotion certificate issued by the personnel office. Indeed, Mrs. Cavallari was the highest scorer of the three, achieving 231 points for certification, in comparison to the 230 points of applicant Bergman, and the 228 points of the ultimately selected Cunha. The threshold qualifying score for the position at issue was 223 points. This objective evaluation and the fact that the personnel office certified Mrs. Cavallari to proceed to the interview stage confirms that she was qualified for the position by Air Force standards. I reject the defendant's suggestion that Mrs. Cavallari must prove, as a *prima facie* matter, that she was "substantially more qualified" than Cunha.[2] The fact that Mr. Cunha, a qualified male, received the promotion and plaintiff, a qualified female, did not, completes the plaintiff's initial burden to present a *prima facie* case. Plaintiff's success, however, ends here.

*Defendant's Burden*

I rule that Mr. Murphy's proffered reasons for considering Mr. Cunha more qualified for the position of Chief Librarian are legitimate and gender-neutral. The federal job description for the position of Chief Librarian required management ability. It was Mr. Murphy's task to evaluate the three certified candidates as to this ability. Once he found discrepancies among the candidates, it was altogether appropriate to consider one candidate, Mr. Cunha, to be more qualified than another, Mrs. Cavallari. Title VII was not intended to diminish such traditional management prerogatives. *Burdine, supra* 450 U.S. at 259, 101 S.Ct. at 1096, *citing United Steelworkers of America v. Weber,* 443 U.S. 193, 205–6, 99 S.Ct. 2721, 2728–29, 61 L.Ed.2d 480 (1979).

Likewise, the Civil Service standard applicable to this case allowed that years of experience be substituted for educational qualifications. Thus, the fact that Mrs. Cavallari possessed a master's degree in library science and Mr. Cunha did not is inconclusive. Mr. Murphy could well have reasoned that both Cunha's more lengthy tenure at this particular library, as well as the comparative nature and quality of his work throughout the years, compensated for what would at first blush appear to be the superior academic credentials of plaintiff Cavallari. The fact that the regulation allows both the personnel office and Mr. Murphy to make this judgment is persuasive authority that he did in fact make this legitimate substitution.

Finally, plaintiff Cavallari's language expertise does nothing to rebut Mr. Murphy's good faith articulation. While it is persuasive that language skills might in fact be most valuable in Mrs. Cavallari's current position as a cataloguer for this particular library, I am by no means convinced that such skills would be equally valuable in the office of chief librarian. Common sense suggests that management ability would be at least as important to a head administrator, if not more so, than specific language skills. Therefore, these credentials possessed by the plaintiff do not rebut Mr. Murphy's reasoning.

*Plaintiff's Rebuttal*

As indicated above, it is plaintiff's responsibility to prove that the reasons articulated by defendant for the employment decision at issue are merely a pretext for sex discrimination. I rule that Mrs. Cavallari has wholly failed to meet this burden. As suggested above, the mere fact that the plaintiff possesses impressive academic credentials and language skills is not conclusive. For although these credentials served to qualify her for the position, they do not, in and of themselves, render her the most qualified. The final stage of this selection process was a subjective one, in which the defendant was entitled to weigh academic credentials along with experience, work performance, and projected management skill in order to decide who was the best qualified for the position.

2. The authority cited for this proposition, *T & S Service Associates v. Crenson,* 666 F.2d 722 (1st Cir.1981) is inapposite. That case was a particular attempt to adapt the Title VII employment standard to competitive bidding for federally funded contracts. No such adaptation is necessary in this, a classic employment case.

I am not unmindful of the risks inherent in subjective decisionmaking of this sort. Nor do I mean to suggest that invocation of such intangible terms as "management ability" shelters an employer from Title VII scrutiny.[3] It is obvious to me, for example, that plaintiff Cavallari and Mr. Murphy did not have a good rapport. She was not perceived to be a "team player," as was Mr. Cunha. The root of this discrepancy may well go back many years, in that Mr. Cunha may, at some point, have been "brought along" by other men in the organization in a way that Mrs. Cavallari was not. But this is not a disparate impact case. Plaintiff has not produced any evidence to support such a theory. Therefore, the Court is in no position to speculate upon one.

Plaintiff presented two pieces of rebuttal evidence in addition to her academic credentials. I have considered them both and find neither persuasive.

### A. The January 1978 Memo

The first is the much debated "affirmative action" memo written by selection official James Murphy, and posted on February 25, 1977. The memo essentially articulates an affirmative action employment policy for the Operational Services Branch. With reference to the Base's Equal Employment Opportunity Plan, Mr. Murphy indicated that "minority personnel and women should receive primary consideration for all vacancies and/or promotions if they can qualify consistent with personnel office regulations".[4]

Under extensive questioning, both at trial and at the administrative hearing below, Mr. Murphy consistently reiterated his interpretation of the memo. First he asserted that the underlying policy of affirmative action was one that he had personally been practicing for several years. He saw the memo, then, as merely public, written articulation of this ongoing policy. Further, he described his implementation of affirmative action as a "tie-breaking" mechanism, i.e.

once assured that two candidates were equally qualified for a position, he would offer the position to the minority or female candidate. He did not give "primary consideration" to Mrs. Cavallari in this case, in that he did not offer her the position as the female candidate, because he did not consider her to be equally qualified with Mr. Cunha.

Plaintiff's theory is that this memo, combined with the actual promotion decision, indicates bad faith on the part of Mr. Murphy, thereby inferring both pretext as to his stated rationales and a resultant discriminatory intent by declining to grant Mrs. Cavallari "primary consideration." Because she maintains that she was equally, if not more, qualified for the position, Mrs. Cavallari seems to be suggesting that her threshold qualification at the personnel office stage entitled her to "primary consideration," i.e. the job. I am unpersuaded for the following reasons.

First, and most importantly, Title VII neither requires nor encompasses any form of affirmative action or preferential treatment. 42 U.S.C. § 2000e–2(j), Burdine, supra 450 U.S. at 259, 101 S.Ct. at 1096. Plaintiff concedes as much. Therefore even if Mr. Murphy consciously ignored affirmative action policies in this case, he cannot be held per se liable for that in a Title VII action. Moreover, I find Mr. Murphy's articulation of the affirmative action standard both credible and appropriate. It is by now a given that affirmative action beneficiaries must be equally qualified as their competitors before the policy is applicable. In short, I am not persuaded that the existence of this memo either rebuts Mr. Murphy's stated rationale for the promotion decision or creates an inference of discriminatory intent.

### B. Statistics

Finally, plaintiff's case initially contained some reference to statistics as to the number of women employees occupying supervi-

---

**3.** See generally, Bartholet, Application of Title VII to Jobs in High Places, 95 Harv.L.Rev. 948 (1982).

**4.** Ex. 1, p. 154.

sory positions in Mr. Murphy's branch. As I indicated at the outset, statistics tending to establish a pattern of discrimination may be used in a Title VII treatment case only to the extent that they bolster an individual's allegation of discriminatory intent. *Banerjee, supra* at 66. The statistics offered here do no such thing, and plaintiff conceded as much by not pursuing this argument at trial. "Given the absence of more specific evidence of ... discrimination, the statistical data is entitled to little weight ... particularly in view of the small numbers involved." *Meehan v. New England School of Law,* 522 F.Supp. 484 (D.Mass.1981).

*Conclusion*

Although plaintiff has stated a *prima facie* case for sex discrimination on the part of the Air Force, the defendant has carried its burden of production by articulating legitimate, gender-neutral reasons for choosing to promote Mr. Cunha and not Mrs. Cavallari. Finding that plaintiff has met neither her burden of showing the defendant's rationale to be pretext, nor her ultimate burden of persuasion as to discriminatory intent, I hereby enter judgment in favor of the defendant.